UNITED STATES of America and Tennessee Valley Authority, Plaintiffs,

v.

GENERAL ELECTRIC COMPANY et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

GENERAL ELECTRIC COMPANY et al., Defendants.

Civ. A. Nos. 29379, 29488–29490, 30297, 29491–29493.

United States District Court
E. D. Pennsylvania.

Aug. 22, 1962.

Fred D. Turnage, H. Robert Halper, Donald G. Balthis, Baddia Rashid, John W. Martin, Jr., Morton M. Fine, Trial Attys., Antitrust Div., Dept. of Justice, for the United States.

Charles J. McCarthy, Beauchamp Brogan, Curtis Sauer, Knoxville, Tenn., for Tennessee Valley Authority.

Henry W. Sawyer, Philadelphia, Pa., for General Electric Co.

Philip H. Strubing, John G. Harkins, Jr., Philadelphia, Pa., Cravath, Swaine & Moore, by Victor M. Earle, III, New York City, for Westinghouse Electric Corp.

Philip H. Strubing, John G. Harkins, Jr., K. Robert Conrad, Philadelphia, Pa., for H. K. Porter, Inc.

Charles A. Wolfe, Ralph W. Brenner, Philadelphia, Pa., for McGraw-Edison Co. and Cutler-Hammer, Inc.

Raymond W. Midgett, Jr., Richard G. Schneider, Philadelphia, Pa., for I-T-E Circuit Breaker Co.

William H. Elliott, Jr., Thomas L. Cantrell, Alfred C. Aurich, Philadelphia, Pa., for Ohio Brass Co.

W. Wilson White, Philadelphia, Pa., for Wagner Electric Corp.

Louis J. Goffman, Philadelphia, Pa., for Federal Pacific Electric Co.

Louis J. Goffman, Philadelphia, Pa., for Cornell-Dubilier Electric Corp.

Miles W. Kirkpatrick, Don B. Blenko, Philadelphia, Pa., for Moloney Electric Co., Square D Co. and Lapp Insulator Co., Inc.

Charles I. Thompson, Jr., Philadelphia, Pa., for Kuhlman Electric Co.

W. Bradley Ward, Edward W. Mullinix, Philadelphia, Pa., for Allis-Chalmers Mfg. Co.

Robert W. Sayre, Philadelphia, Pa., for A. B. Chance Co.

KRAFT, District Judge.

Following a grand jury investigation of the electrical equipment industry, the Government instituted these civil actions for damages under the Clayton Act, 15 U.S.C.A. § 12 et seq. and the False Claims Act, 31 U.S.C.A. § 231 et seq.[1] Tennessee Valley Authority is co-plaintiff in five of the suits.

The cases are now before us on three motions by defendants, all of which will be considered and disposed of in one opinion.

Defendants' first motion is to impound grand jury minutes and documents and for allied relief. We are called upon to determine the validity of the Government's claim that testimony and documents developed and produced in a Federal grand jury investigation are available for its use in the preparation and trial of its civil damage suits. The basic consideration involved is, of course, the traditional secrecy of grand jury proceedings. The reasons for secrecy are many and varied, and we need not stop at this point to discuss them in detail. See, e. g., Pittsburgh Plate Glass Company v. United States, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959); United States v. Procter & Gamble Company, 356 U.S. 677, 7 S.Ct. 983, 2 L.Ed.2d 1077 (1958); United States v. Rose, 215 F.2d 617 (3rd Cir. 1954); In re April 1956 Term Grand Jury, 239 F.2d 263 (7th Cir. 1956); 8 Wigmore, Evidence (3d ed. 1940), § 2360.

For present purposes, at least, the traditional policy of grand jury secrecy is embodied in F.R.Cr.P. 6(e), 18 U.S.C.:

*"(e) Secrecy of Proceedings and Disclosure.* Disclosure of matters occurring before the grand jury

---

1. A concise account of the grand jury investigation and the criminal prosecutions based thereon may be found in Application of State of California, 195 F.Supp. 37 (E.D.Pa.1961).

other than its deliberations and the vote of any juror may be made to the attorneys for the government for use in the performance of their duties. Otherwise a juror, attorney, interpreter or stenographer may disclose matters occurring before the grand jury only when so directed by the court preliminarily to or in connection with a judicial proceeding or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury. No obligation of secrecy may be imposed upon any person except in accordance with this rule. * * * "

F.R.Cr.P. 54(c) defines "Attorney for the government" as " * * * the Attorney General, an authorized assistant of the Attorney General, a United States Attorney, an authorized assistant of a United States Attorney * * *."

Manifestly, the second sentence of Rule 6(e) is not directly involved here, since there has been no application to the Court in connection with the Government's use of grand jury materials.

The gist of defendants' contention, as we understand it, is that the first sentence, declaring the right of attorneys for the Government to have disclosure of the grand jury transcript "for use in the performance of their duties," refers only to their duties in an "enforcement proceeding," to wit, a criminal prosecution or a civil equity action under section 4 of the Sherman Act, 15 U.S.C.A. § 4. This seems to us an unduly narrow construction of the Rule.

Passing the question whether a civil damage suit by the Government is not itself a form of enforcement action,— as to which, see United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943)—the duties of Government attorneys are by no means limited to enforcement proceedings. The attorneys for the Government in these actions are authorized by statute to conduct "any kind of legal proceeding, civil or criminal," in which the United States is a party in interest. 5 U.S.C.A. § 310. On principle, it would seem that the United States is no less interested in recouping losses suffered from violations of its laws than in the enforcement of the same laws.

Moreover, we are not persuaded that defendants' construction of Rule 6(e) is required, as defendants assert, by the context "in which it appears, namely, as part of the criminal rule relating to a body convened for the sole purpose of investigating possible violations of criminal statutes." Courts, on more than one occasion, have construed the first part of the *second* sentence of the Rule as applying to civil damage suits. In Herman Schwabe, Inc. v. United Shoe Machinery Corp., 194 F.Supp. 763 (D. Mass.1958), a private treble damage action under the antitrust laws, defendant was granted access to plaintiff's testimony before a grand jury investigating the defendant. Similarly, in a recent case in this District, Judge Lord—"solely on the strength of the particular and peculiar situation here presented"—allowed the defendant in a private civil action to inspect the transcript of the grand jury testimony of one of the plaintiffs. In the Matter of Special 1952 Grand Jury, 22 F.R.D. 102 (E.D.Pa. 1958). To the same effect, see United States v. Ben Grunstein & Sons Company, 137 F.Supp. 197 (D.N.J.1955), infra.

We believe that it would be illogical to construe the second sentence of Rule 6(e) to permit disclosure of grand jury matters in civil damage actions, but to interpret the first sentence of the same Rule to mean that disclosure of grand jury matters to Government attorneys is limited to use only in criminal or quasi-criminal proceedings.

Counsel have not cited and our own extensive research has failed to disclose a single case in which the precise question before us has been expressly raised or adjudicated. However, in at least two cases it has been assumed, without discussion of the point, that the Govern-

ment was within its rights in using grand jury materials in a civil damage suit based on the very matters which were before the grand jury. In United States v. General Motors Corp., 15 F.R.D. 486 (D.Del.1954), the Government sued for treble damages under the Elkins Act, 49 U.S.C.A. § 41, contending that the defendant received from the Baltimore & Ohio Railroad an unlawful rebate against regular transportation charges. The rebate transaction had been presented to two Federal grand juries under the criminal provisions of the Elkins Act. In preparing for trial of the civil action, defendant filed a motion under F.R.Civ.P. 34, 28 U.S.C.A. for an order directing the United States to produce the transcripts of the grand jury hearings. In denying the motion, the Court stated (p. 488):

"I do not find in the present action for civil penalties any justification for ordering production for inspection and copying the transcripts of the Grand Jury's meetings. *It is argued the Department of Justice will have the transcripts of the Grand Jury available and may use them, and such, it is suggested, will be a tactical advantage the discovery rules were designed to eliminate.* But defendant, here, has other discovery techniques at its disposal through which most of the information sought and clues to other possible sources may be obtained." (Emphasis supplied)

United States v. Ben Grunstein & Sons Company, 137 F.Supp. 197 (D.N.J.1955), was a civil proceeding by the United States for damages under the False Claims Act. A grand jury investigation had resulted in the indictment and conviction, under the criminal provisions of the Act, of two of the defendants in the civil action. In granting limited disclosure of grand jury minutes on defendants' motions, the Court noted (p. 199):

"Defendants allege, as the necessary 'good cause' for such application, *the fact that plaintiff has present access to these entire minutes,*

thus giving plaintiff a great tactical advantage over defendants, who lack same." (Emphasis supplied)

Defendants place special reliance on In re April 1956 Term Grand Jury, 239 F.2d 263 (7th Cir. 1956). While certain language of that opinion, viewed in isolation, seems to lend some support to defendants' position, the case must be read in the light of the particular situation there presented. Indeed, that part of the opinion quoted on page 18 of defendants' brief is preceded in the report by the caveat: "Therefore, in the situation presented to us in the case at bar. * * * " In that case the uncontradicted facts were that the Treasury Department had, by various administrative subpoenas, endeavored to gain access to certain documents and records and, having failed in that effort, made no attempt to compel compliance with the administrative subpoenas, apparently abandoning all available civil procedures. Upon the recommendation of the Treasury Department, to which the Department of Justice acceded, the grand jury began an investigation into the income tax returns and alleged related matters of the persons in question. Resort was then had to grand jury subpoenas which brought before the grand jury the documents and records previously sought by administrative subpoena. This material, with the grand jury's assent, was then turned over to Treasury agents who examined it for the purported purpose of assisting the grand jury, which had, meanwhile, temporarily recessed. Under these facts the Court said, (239 F.2d p. 272):

"While we hold that the district court cannot properly interfere with the action of the grand jury in turning over to third persons, including treasury agents, voluminous records and accounts for the sole purpose of examination and report to the grand jury, as an assistance to it, we also hold that persons, nonmembers of the grand jury, thus having access to said records and documents, have no right to use them for any purpose whatsoever except to assist the

grand jury in its work. Such persons may not in any manner use these records and documents, or any information acquired therefrom, for any other purpose, and specifically for any civil purpose, such as tax collection or otherwise."

No construction of the first sentence of F.R.Cr.P. 6(e) was involved, since the disclosure complained of was to Treasury agents, not Government attorneys. So far as is here material, the Court's ruling really condemned the perversion of grand jury proceedings to procure for use in a civil case evidence which had been otherwise unobtainable.

Defendants also place great stress on a passage in the opinion in In re Petroleum Industry Investigation, 152 F.Supp. 646, (E.D.Va.1957), in which the Court refused to limit the United States' use of documents subpoenaed for the grand jury to "this proceeding only." Pointing out that the use of such documents by Government counsel in other proceedings would be proper and even mandatory in light of their duty to enforce the law, the Court continued (p. 647):

"Akin is the anticipated use by the Government of the documents, or the knowledge derived from them, in a civil action should the grand jury not indict. *A civil suit predicated on antitrust or similar legislation, when brought by the Government, is in fact and in law a prosecution. Its aim is not compensation but correction.* The obligation of the Justice Department to invoke civil remedies in an appropriate situation is just as bounden as its duty to institute requisite criminal proceedings. Consequently, if books and papers coming to the knowledge of the Government's attorneys in a grand jury investigation develop a demand, and an adequacy of proof, for resort to civil litigation in the public interest, it is certainly proper, indeed incumbent upon them, to use for that purpose the information in their hands. This is nonetheless true though no process available in a civil action has the competency to discover this data before hand." (Emphasis supplied)

Defendants would have us interpret the emphasized language to mean that the Government's use of such materials is limited to corrective rather than compensatory actions, and that their use in a civil *damage* action would therefore be improper. We do not so understand it. That precise question was not before the Court. Moreover, the Court's later expression "develop a demand, and an adequacy of proof, for resort to civil litigation in the public interest" could apply with equal force to civil actions for damages and for injunction.

Finally, defendants rely on some of the language in United States v. Procter & Gamble Company, 180 F.Supp. 195, at pp. 203–204, (D.N.J.1959) the antecedent appellate history of which need not be related here. Before the Court was defendants' motion which sought, inter alia, to prevent, in the Government's civil injunction action, its use of the transcript of the proceedings before the grand jury and "any leads therefrom which the Government may have obtained." The motion was denied by the Court which cited United States v. Wallace & Tierman Co., 336 U.S. 793, 69 S.Ct. 824, 93 L.Ed. 1042 (1949), and United States v. Procter & Gamble Co., 356 U.S. 677, 684, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1957), and held that F.R.Cr.P. 6(e) does not limit to use only in "criminal proceedings" the grand jury material disclosed to Government attorneys.

Defendants before us urge that by necessary implication that case must be construed to mean that disclosure to Government attorneys may only be made for use in a criminal prosecution or a civil injunctive action because the Sherman Act is primarily a criminal statute; that while Section 4 thereof prescribes an equitable remedy, it invests the Courts with jurisdiction only to prevent and restrain violations of Sections 1 to 7 thereof and no more. From this, defendants argue that in a grand jury proceeding investigating possible violations

of the Sherman Act the prime question is whether "criminal" violations of that Act have occurred or are apt to occur; that because the inquiry is as to "criminal" violations, disclosure to Government attorneys is permissible for use in the performance of their duties only because the material disclosed relates to or bears upon "criminal" violations; and that the material so disclosed may only be used upon trial of an indictment for such violation or upon trial of an action to prevent or enjoin such violation.

This argument overlooks the plain language of 15 U.S.C.A. § 15a which provides that the United States may sue and recover actual damages whenever it has been injured in its business or property "by reason of anything forbidden in the antitrust laws." If disclosure to Government attorneys is permissible for use in prosecutions upon indictments for violations of the penal provisions of the Sherman Act, and in civil proceedings for injunctive relief against like violations, it would appear contrary to reason to hold that such disclosure is forbidden for use in the Government's actions for damages, when, as in these cases, the Government's damage suits allege as their bases the very violations of penal provisions of the Sherman Act for which the Government prosecuted the defendants by indictment and, as well, brought actions for injunction.

We are persuaded that F.R.Cr.P. 6(e), reasonably construed, authorizes the use by the Government attorneys of the grand jury material in these actions for damages. It may be as the Government contends, that the language of the Rule is too clear to require construction. In any event, any question of the meaning of the provision must be resolved by reference to the time-honored policy of grand jury secrecy and the philosophy behind it. All roads of inquiry seem to lead back to United States v. Amazon Industrial Chemical Corporation, 55 F.2d 254, 261 (D.Md.1931):

"The reasons which lie behind the requirement of secrecy may be summarized as follows: (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before the grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect the innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt."

We think none of these reasons and none advanced by defendants dictates that the grand jury materials should be kept secret from the Government's attorneys in these cases. Defendants have favored us with able, comprehensive and extensive arguments, but have failed to convince us that denial of these materials to the attorneys for the Government would serve any of the purposes justifying secrecy.

█ The attorneys for Tennessee Valley Authority obviously do not fall within the purview of the first sentence of F.R.Cr.P. 6(e), and may not avail themselves of these grand jury materials.

We conclude, therefore, that defendants' motion to impound, etc., must be denied with respect to the United States of America, and granted as to Tennessee Valley Authority.

██ We turn now to consideration of the second motion. In Count 1 of each of the complaints in which it appears as co-plaintiff, Tennessee Valley Authority (TVA) claims treble damages, costs of suit and attorney's fees, under § 4 of the Clayton Act, 15 U.S.C.A. § 15. Defendants in those actions have moved for partial summary judgment on Count 1 of each complaint, on the ground that

TVA is not a person entitled to sue within the meaning of § 4.

That section provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the anti-trust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

Section 1 of the Clayton Act, 15 U.S.C.A. § 12, defines "person" to include, inter alia, "corporations and associations existing under or authorized by the laws of * * * the United States * * *."

In the landmark case of United States v. Cooper Corp., 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071 (1941), it was held that the term "person," as used in § 7 of the Sherman Act, did not include the United States. (The definition of "person" in § 8 of the Sherman Act was identical with that in § 1 of the Clayton Act.) In that case, the Court laid down the guidelines which control us in resolving the present issue, 312 U.S. at p. 605, 61 S.Ct. 742, at p. 743:

"Decision is not to be reached by a strict construction of the words of the Act, nor by the application of artificial canons of construction. On the contrary, we are to read the statutory language *in its ordinary and natural sense*, and if doubts remain, resolve them in the light, not only of the policy intended to be served by the enactment, but, as well, by all other available aids to construction. But it is not our function to engraft on a statute additions which we think the legislature logically might or should have made." (Emphasis supplied)

TVA is a corporation created by and existing under the Tennessee Valley Authority Act of 1933. 16 U.S.C.A. §§ 831–831dd. Section 1 of the Act provides that

" * * * there is created a body corporate by the name of the 'Tennessee Valley Authority' (hereinafter referred to as the 'Corporation')."

If we are to read the statutory language in its "ordinary and natural sense," as we are enjoined in Cooper, supra, it would appear incontestable that TVA is a "person" within the meaning of § 4 of the Clayton Act and entitled to maintain suit thereunder.

Defendants, however, deprecate what they term "an unrealistic and technical matching of words" to reach a holding that, because it is a corporation, TVA is a "person" within the meaning of § 4. In our view we are left with no alternative. When the words of a statute are plain there is no room for construction. If the language be clear, it is conclusive. Osaka Shosen Kaisha Line v. United States, 300 U.S. 98, 101, 57 S.Ct. 356, 81 L.Ed. 532 (1937). In Chattanooga Foundry & Pipe Works v. Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906), where the question was whether the City of Atlanta could maintain an action under § 7 of the Sherman Act, the Court stated, "The city was a person within the meaning of § 7 by the express provision of § 8."

Defendants seek to distinguish TVA from the general run of corporations on the ground that TVA is a governmental agency in corporate form wholly owned by the United States. It is referred to in § 19 of the Act as "an instrumentality and agency of the Government of the United States." 16 U.S.C.A. § 831r. It is one of some 40 governmental corporations listed in a footnote in Keifer & Keifer v. R. F. C., 306 U.S. 381, at p. 390, 59 S.Ct. 516, at p. 518, 83 L.Ed. 784 (1939). In speaking of the reason for, and the growth of, these corporations, the Court stated (p. 390, 59 S.Ct. p. 518):

"Because of the advantages enjoyed by the corporate device compared with conventional executive

agencies, the exigencies of war and the enlarged scope of government in economic affairs have greatly extended the use of independent corporate facilities for governmental ends."

In United States Shipping Board Emergency Fleet Corp. v. Western Union, 275 U.S. 415, p. 423, 48 S.Ct. 198, p. 201, 72 L.Ed. 345 (1928), the Court gave a more precise reason for employment of these corporate devices:

"An important, if not the chief, reason for employing a corporate agency was to enable the Government to employ commercial methods and to conduct the operations with a freedom supposed to be inconsistent with accountability to the Treasury under its established procedure and with its control over the financial operations of the United States."

It may be that when the Clayton Act was enacted in 1914, governmental corporations of the type of TVA were a comparative rarity. Nevertheless, governmental corporations were by no means unknown, and it is not our function to draw hypertechnical distinctions between one kind of corporation or association and another. See United Mine Workers of America v. Coronado Coal Co., 259 U.S. 344, 392, 42 S.Ct. 570, 66 L.Ed. 975 (1922).

Defendants assert that the real purpose of the treble damage provisions [2] in the Sherman and Clayton Acts was to provide an incentive to "private" persons to enforce the antitrust laws through the media of damage actions. However, Chattanooga Foundry & Pipe Works v. Atlanta, supra, teaches that the treble damage incentive is equally available to municipal corporations. From their purpose premise defendants argue that such a purpose would require exclusion of a Governmental corporation of TVA's type from the status of a "person" entitled to sue for treble damages; further, defendants contend that it would be unreasonable or illogical to promote enforcement of the antitrust laws by means of treble damage suits brought by corporations owned entirely by the very Government upon which the primary duty of enforcement devolves.

Defendants urge, too, that there is no rational basis for TVA's contention that the treble damage remedy should be accorded to it, a governmental agency, yet be withheld from the Government itself; that such a construction would make the right to sue for treble damages depend on the form in which Congress created a particular agency or on the name in which suit is brought. However, the form in which Congress created TVA was not the result of fortuitous or capricious circumstance. The very reason for utilization of the corporate form was to free this agency from the inadequacies and restraints of the conventional executive agency. If the distinction in present regard be, indeed, completely without basis in reason, logic, or experience, then the remedy must be with Congress.

2. Section 4A of the Clayton Act, as added July 7, 1955, 69 Stat. 282, 15 U.S.C.A. § 15a, gave the United States the right to sue for actual damages sustained and the cost of suit. The Senate Report which accompanied the bill (H.R. 4954) which was ultimately enacted as § 4A (S.Rep. 619, 84th Cong., 1st Sess., p. 3 (1955)) U.S.Code Cong. and Adm.News 1955, p. 2330 stated in part:

"It should be noted, however, that the bill would grant to the Government the right to recover only actual, as distinguished from treble damages. This difference in treatment is a recognition of the difference in the position of the United States and of 'persons' in this connection. Both may recover their actual damages. The damages of 'persons' are trebled so that private persons will be encouraged to bring actions which, though brought to enforce a private claim, will nonetheless serve the public interest in the enforcement of the antitrust laws. The United States is, of course, charged by law with the enforcement of the antitrust laws and it would be wholly improper to write into the statute a provision whose chief purpose is to promote the institution of proceedings. The United States is, of course, amply equipped with the criminal and civil process with which to enforce the antitrust laws."

We are not free to ignore the clear and unequivocal language of the statute even if it were productive, in our view, of an anomalous or invidious discrimination.

As the Court said in Cooper, supra, 312 U.S. at p. 606, 61 S.Ct. 742, at p. 744, 85 L.Ed. 1071:

"The recent expressions of this court in Tigner v. Texas, 310 U.S. 141, 148, 149, [60 S.Ct. 879, 84 L.Ed. 1124], warn that it is not for the courts to indulge in the business of policy-making in the field of anti-trust legislation. * * * Our function ends with the endeavor to ascertain from the words used, construed in the light of the relevant material, what was in fact the intent of Congress."

We conclude that TVA is a "person" and may sue for treble damages under § 4 of the Clayton Act.

██ Defendants also earnestly contend that the remedy under § 4 is not available to TVA because TVA is an integral part of the Government of the United States, and that damage to the business and property "entrusted" to TVA is damage to the business and property of the United States.

We do not concur in defendants' view. We may not ignore the separate reality and existence of TVA merely because it is a corporate governmental agency. In the piquant language of Mr. Justice Holmes, "The meaning of incorporation is that you have a person, and as a person one that presumably is subject to the general rules of law." [3]

The corporate entity principle as respects Government corporations was recognized and applied in U. S. ex rel. Skinner & Eddy Corp. v. McCarl, 275 U.S. 1, 11, 48 S.Ct. 12, 15, 72 L.Ed. 131 (1927),

which presented the question of authority to settle and adjust private claims against the Emergency Fleet Corporation:

"For the Fleet Corporation is an entity distinct from the United States and from any of its departments or boards; and the audit and control of its financial transactions is, under the general rules of law and the administrative practice, committed to its own corporate officers except so far as control may be exerted by the Shipping Board."

All corporate governmental agencies are in one sense integral parts of the Government, since they perform exclusively governmental functions.[4] In United States Shipping Board Emergency Fleet Corp. v. Western Union, supra, 275 U.S. at p. 426, 48 S.Ct. at p. 202, it was held that the Fleet Corporation was a "department of the United States" within the meaning of the Post Roads Act, 47 U.S.C.A. §§ 1–3, 6, but that holding made that Corporation no less a separate legal entity, as held in McCarl, supra, 275 U.S. at p. 11, 48 S.Ct. at p. 15.

We think an equally perceptible distinction exists between the business and property of the United States, on the one hand, and the business and property of its corporate agency, TVA, on the other. That thought is given point and substance in Federal Housing Administration Region No. 4 v. Burr, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940), in which the Housing Administration challenged a judgment rendered against it in an action of garnishment on money due one of its employes, as well as the allowance of execution on the judgment. Although property of the United States is, of course, not subject to execution or similar process, the Supreme Court up-

3. Sloan Shipyards Corporation v. U. S. Fleet Corp., 258 U.S. 549, 567, 42 S.Ct. 386, 66 L.Ed. 762 (1922).

4. "Legitimate activities of governments are sometimes classified as 'governmental' or 'proprietary'; however, our decisions have made it clear that the Federal Government performs no 'proprie-

tary' functions. If the enabling Act is constitutional and if the instrumentality's activity is within the authority granted by the Act, a governmental function is being performed." Federal Land Bank of Wichita v. Kiowa County, 368 U.S. 146, 150, 82 S.Ct. 282, 286, 7 L.Ed.2d 199 (1961).

held both the judgment and the allowance of execution. With respect to the execution, it stated (p. 250, 60 S.Ct. p. 492):

"* * * execution is not barred, for it would seem to be a part of the civil process embraced within the 'sue and be sued' clause. That does not, of course, mean that any funds or property of the United States can be held responsible for this judgment. Claims against a corporation are normally collectible only from corporate assets. That is true here. Congress has specifically directed that all such claims against the Federal Housing Administration of the type here involved 'shall be paid out of funds made available by this Act.' § 1. Hence those funds, and only those, are subject to execution. The result is that only those funds which have been paid over to the Federal Housing Administration in accordance with § 1 and which are in its possession, severed from Treasury funds and Treasury control, are subject to execution."

The TVA Act provides that real property acquired by TVA shall be taken in the name of the United States and entrusted to TVA as its agent to accomplish the purpose of the Act. 16 U.S.C.A. §§ 831c(h), 831x. It seems not to be contested that all other property is acquired in the name of TVA and becomes its property. Section 7(a) refers to "property to be acquired by the Corporation in its own name or in the name of the United States." 16 U.S.C.A. § 831f(a). Section 5(j) authorizes TVA to manufacture explosives and sell them to the United States. 16 U.S.C.A. § 831d(j). Section 5(m) prohibits sale of "products of the Corporation" outside of the United States "except to the United States Government for the use of its Army and Navy." 16 U.S.C.A. § 831d(m). Section 21(a) provides that certain general statutes relating to property of the United States "shall apply to the moneys and property of the Corporation." 16 U.S.C.A. § 831t(a). Section 26 empowers TVA to use proceeds,

inter alia, from its power operations "in conducting *its business* in generating, transmitting, and distributing electric energy." 16 U.S.C.A. § 831y.

These provisions, without more, are sufficient to indicate that, except for real property, all the property under TVA's control is the property of TVA and not of the United States. TVA's business is its own, and not that of the United States. If TVA was injured by defendants' alleged acts, the injury must have been to its business or personal property. As the Court said in Chattanooga Foundry & Pipe Works v. Atlanta, supra, 203 U.S. at p. 396, 27 S.Ct. at 66:

"It was injured in its property, at least, if not in its business of furnishing water, by being led to pay more than the worth of the pipe. A person whose property is diminished by a payment of money wrongfully induced is injured in his property."

Defendants cite cases involving situations in which the separate entity of the corporate agency was disregarded for limited purposes. Typical of these is Inland Waterways Corporation v. Young, 309 U.S. 517, 60 S.Ct. 646, 84 L.Ed. 901 (1940), which involved the right of a national bank to pledge assets to secure deposits of funds by Inland, a corporation wholly owned by the United States and organized to develop and operate barge lines on the Mississippi. National banks had power to secure deposits of the United States Government by pledging assets, but lacked such power with respect to private deposits, or deposits by state and local governments. In sustaining the challenged power, the Court stated (pp. 523–524, 60 S.Ct. p. 650):

"So far as the powers of a national bank to pledge its assets are concerned, the form which Government takes—whether it appears as the Secretary of the Treasury, the Secretary of War, or the Inland Waterways Corporation—is wholly immaterial. The motives which lead Government to clothe its activities in corporate form are entirely unrelated to the problem of safeguarding

governmental deposits, and therefore irrelevant to the issue of *ultra vires*. \* \* \* The true nature of these modern devices for carrying out governmental functions is recognized in other legal relations when realities become decisive. \* \* \* *The funds of these corporations are, for all practical purposes, Government funds; the losses, if losses there be, are the Government's losses*." (Emphasis added)

This is a far cry from a holding that Inland was identical with and inseparable from the United States, and hence incapable of being injured in its own business and property. Indeed, the Court makes reference to the "funds of these corporations." There can be no doubt of Inland's right to sue for injury to these funds in an appropriate case.

We conclude that, for present purposes at least, TVA is an entity distinct from the United States, and that its business and property, except for real property, is separate and distinct from that of the United States.

The decision in Cooper, supra, led to the enactment in 1955 of § 4A of the Clayton Act, 15 U.S.C.A. § 15a:

"Whenever the United States is hereafter injured in its business or property by reason of anything forbidden in the antitrust laws it may sue therefor in the United States district court for the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover actual damages by it sustained and the cost of suit."

Defendants contend that "whatever the situation was before then, after 1955 TVA was precluded from asserting any rights under Section 4." We disagree. The amendment relates only to the United States. Its language is clear and unambiguous and requires no construction. We find nothing in the language of the amendment, or in its legislative history, to support the contention of a repeal by implication of § 4, insofar as that section conferred a right of action on TVA.

Defendants' motions for partial summary judgment against TVA on Count 1 of the complaints wherein TVA is co-plaintiff will, therefore, be dismissed.

 Defendants' third and last motion is for partial summary judgment with respect to all Clayton Act claims which accrued more than four years prior to the filing of the complaint, and as to all claims under the False Claims Act which accrued more than six years prior to such filing. For the purposes of these cases, the Government has stipulated that the six-year statute applies in the case of all claims under the False Claims Act.

We are thus faced with the single issue whether or not the federal doctrine of fraudulent concealment tolls the running of the statute of limitations contained in § 4B·of the Clayton Act, 15 U.S.C.A. § 15b:

"Any action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued. No cause of action barred under existing law on the effective date of this section and sections 15a and 16 of this title shall be revived by said sections."

It is to be noted that the United States can seek damages only on claims accruing on or after January 7, 1956, the effective date of § 4A. Since, in our view, TVA is a "person" within the meaning of § 4, it is not, of course, so limited.

Our inquiry begins with the leading case of Bailey v. Glover, 88 (21 Wall.) U.S. 342, 22 L.Ed. 636 (1874). In that case, Glover's assignee in bankruptcy instituted suit, some three years after his appointment, to set aside certain conveyances. The bill alleged that the bankrupt had fraudulently conveyed all his estate to members of his family in order to avoid the payment of a debt, and then applied for a discharge under the federal bankruptcy laws. The bill fur-

ther alleged that the secrecy of the conveyances and the concealment of the fraudulent acts from the assignee and the creditor prevented them from obtaining any information until some time within two years prior to the filing of suit. The lower court sustained defendants' demurrer to the bill on the ground that the suit was not brought within two years from the assignee's appointment. Section 2 of the Bankruptcy Act of 1867, 14 Stat. 518, under which the suit was brought, provided in material part:

"The Circuit Court shall have concurrent jurisdiction *of all suits at law or in equity,* brought by the assignee, against any person claiming an adverse interest; * * * but *no suit at law or in equity* shall in any case be maintainable by or against such assignee touching the property or rights of property aforesaid, in any court whatsoever, unless the same shall be brought within two years from the time of the cause of action accrued for or against such assignee." (Emphasis supplied)

In reversing, the Supreme Court first considered the effects of fraud on the running of the statute in suits in equity, 88 U.S., at pp. 347–348:

"In suits in equity where relief is sought on the ground of fraud, the authorities are without conflict in support of the doctrine that where the ignorance of the fraud has been produced by affirmative acts of the guilty party in concealing the facts from the other, the statute will not bar relief provided suit is brought within proper time after the discovery of the fraud.

"We also think that in suits in equity the decided weight of authority is in favor of the proposition that where the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or ef-

forts on the part of the party committing the fraud to conceal it from the knowledge of the other party."

The Court referred to the "very decided conflict of authority" on the question as it arises in actions at law, but concluded, 88 U.S., at p. 349:

"But we are of the opinion, as already stated, that the weight of judicial authority, both in this country and in England, is in favor of the application of the rule to suits at law as well as in equity. And we are also of opinion that this is founded in a sound and philosophical view of the principles of the statutes of limitation. They were enacted to prevent frauds; to prevent parties from asserting rights after the lapse of time had destroyed or impaired the evidence which would show that such rights never existed, or had been satisfied, transferred, or extinguished, if they ever did exist. To hold that by concealing a fraud, or by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which was designed to prevent fraud the means by which it is made successful and secure. And we see no reason why this principle should not be as applicable to suits tried on the common-law side of the court's calendar as to those on the equity side."

The Court then stated what has come to be known as the fraudulent concealment doctrine, 88 U.S., at pp. 349–350:

"* * * we hold that when there has been no negligence or laches on the part of a plaintiff in coming to the knowledge of the fraud which is the foundation of the suit, and when the fraud has been concealed, or is of such character as to conceal itself, the statute does not begin to run until the fraud is discovered by, or becomes known to, the party suing, or those in privity with him."

The Federal rule as to the effect of concealment on the running of a period of limitations, as thus established, must be distinguished from that prevailing in some states, notably Pennsylvania. See, the leading case of Smith v. Blachley, 198 Pa. 173, 47 A. 985, 53 L.R.A. 849 (1901), which holds that, in addition to the "original fraud," there must be "affirmative efforts to divert or mislead or prevent discovery."

Bailey v. Glover was followed in Exploration Company, Ltd. v. United States, 247 U.S. 435, 38 S.Ct. 571, 62 L.Ed. 1200 (1918), in which the United States brought an action at law to cancel coal land patents allegedly procured from the United States by fraud. The question involved was whether the suit, brought more than six years after the patents had been issued, was barred by the statute of limitations under the Act of March 3, 1891, 26 Stat. 1099, 46 U.S.C.A. § 1166, which provided that "suits to vacate and annual patents hereafter issued shall only be brought within six years after the date of the issuance of such patents." It was held that the statute did not begin to run until the discovery of the fraud. The Court pointed out that Bailey v. Glover "has never been overruled nor modified in this court and has been approved and followed," and went on to state, 247 U.S., at p. 449, 38 S.Ct. at p. 573:

"When Congress passed the act in question the rule of Bailey v. Glover was the established doctrine of this court. It was presumably enacted with the ruling of that case in mind. We cannot believe that Congress intended to give immunity to those who for the period named in the statute might be able to conceal their fraudulent action from the knowledge of the agents of the Government. We are aware of no good reason why the rule, now almost universal, that statutes of limitations upon suits to set aside fraudulent transactions shall not begin to run until the discovery of the fraud, should not apply in favor of the

Government as well as a private individual."

In Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946), a class suit by creditors of a joint stock land bank to enforce the liability imposed upon shareholders of the bank by § 16 of the Federal Farm Loan Act, 12 U.S. C.A. § 812, the alleged fraud was concealment of the shareholders' identity. The Court invoked Bailey v. Glover, and applied the fraudulent concealment doctrine to toll the New York statute of limitations, Civil Practice Act, § 53, 327 U.S., at p. 397, 66 S.Ct. at p. 585:

"And so this Court long ago adopted as its own the old chancery rule that where a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party.' Bailey v. Glover, 21 Wall. 342, 348; and see Exploration Co. v. United States, 247 U.S. 435 [38 S.Ct. 571, 62 L.Ed. 1200]; Sherwood v. Sutton, [Fed.Cas.No. 12,782] 5 Mason 143.

"This equitable doctrine is read into every federal statute of limitation. If the Federal Farm Loan Act had an explicit statute of limitation for bringing suit under § 16, the time would not have begun to run until after petitioners had discovered, or had failed in reasonable diligence to discover, the alleged deception by Bache which is the basis of this suit. Bailey v. Glover, supra; Exploration Co. v. United States, supra; United States v. Diamond Coal Co., 255 U.S. 323, 333 [41 S.Ct. 335, 65 L.Ed. 660]. It would be too incongruous to confine a federal right within the bare terms of a State statute of limitation unrelieved by the settled federal equitable doctrine as to fraud, when even a federal statute in the

same terms would be given the mitigating construction required by that doctrine."

Perhaps the most recent application of the federal concealment rule is found in Moviecolor Limited v. Eastman Kodak Company, 288 F.2d 80 (2d Cir. 1961), an action under the Clayton Act based on conspiracy. The Court expressly held that the federal rule as to the effect of concealment on the running of a period of limitation applies to an action .for treble damages under the Clayton Act even when a *state statute* is used to measure the period, although the Court noted that it could dispose of the appeal solely on the ground that the complaint did not contain allegations sufficient to bring plaintiff within the rule.

In two recent cases in this District, it was assumed without discussion that the doctrine of fraudulent concealment was applicable. Dovberg v. Dow Chemical Co., 195 F.Supp. 337 (E.D.Pa.1961); Philco Corporation v. Radio Corporation of America, 186 F.Supp. 155 (E.D.Pa. 1960).

Since we are persuaded that the complaints contain allegations sufficient to bring plaintiffs within this federal rule, the Supreme Court cases above cited would appear dispositive of the issue. Defendants, however, seeking to distinguish these cases on one ground or another, say that while the rule of Bailey v. Glover, as it has developed, "does not require the sort of separate and distinct affirmative act of concealment" such as appeared in some of the cases, it *does* require "that the cause of action sound in fraud and that the fraud be a continuing, self-renewing kind, so that throughout the duration of the fraud there is a continuing misrepresentation." Bailey v. Glover did, indeed, sound in fraud. However, Holmberg v. Armbrecht, supra, was an action to collect a statutory liability imposed on stockholders of joint stock land banks, 12 U.S.C.A. § 812, where the only "fraud" was concealment of the shareholders' identity. As to the "continuing" nature of the fraud, it is difficult to conceive any case

in which the force of undisclosed fraudulent conduct is fully spent so long as the perpetrator continues to enjoy the fruits of his dereliction.

In Exploration Co., Ltd. v. United States, supra, coal land patents were procured by fraud upon false affidavits which failed affirmatively to disclose the real party in interest. Defendants assert that ownership of land is a "continuing status," not an isolated event, and that the continued enjoyment of such ownership is dependent each day "upon a continuing false assertion." So is the continued receipt or retention of economic benefits derived from fraudulent noncompetitive bidding.

Plaintiffs' allegations, as we read them, embrace affirmative acts of concealment as well as fraud of such character as to conceal itself. In American Tobacco Co. v. People's Tobacco Co., 204 F. 58 (5th Cir. 1913), a treble damage suit based on conspiracy under the Sherman Act, it was indicated that no affirmative act of concealment is required to toll the statute.

We opine that the fraudulent concealment doctrine, under Bailey v. Glover and cases following it, operates to extend the four years limitations period of § 4B, unless there is some indication of a contrary Congressional intent. Defendants profess to find such intent in an analysis of the language of § 4B, considered in connection with the language of § 5, which was amended at the time of the enactment of § 4B. They rely strongly upon the presence in each provision of the phrase "shall be forever barred," in prescribing the period of limitation. We attach little significance, either to the repetition of the words or to the emphatic quality of the words themselves.

Neither do we attach great significance to the decision in United States v. Borin, 5 Cir., 209 F.2d 145 (1954), which held that the limitation provision of the False Claims Act, declaring that every suit shall be commenced within six years from the commission of the act, and not afterward, discloses no intention to extend the limitations period on account

of any fraud or concealment. The vast differences between the Clayton Act and the False Claims Act, with respect to nature, subject-matter and purpose, make comparisons of little value for present purposes.

Defendants earnestly contend that the legislative history of § 4B conclusively establishes that Congress could not have intended that concealment operate to toll the limitations period. Since this equitable doctrine is read into every federal statute of limitations, Holmberg v. Armbrecht, supra, we take it that the evidence of a negative intent on the part of Congress would need to be clear and unambiguous. Our thorough study of the somewhat lengthy history of § 4B convinces us that such evidence is totally lacking. It appears to us, indeed, that the evidence points the other way and establishes that Congress fully intended to apply the fraudulent concealment doctrine to § 4B with full force and effect.

We think the legislative history of prior bills is of little aid in the present inquiry, although we have carefully considered it. With respect to the rejection of proposed discovery provisions in some of the early bills, no clear distinction seems to have been observed in these proposals between a failure to discover due to fraudulent concealment and a mere failure to discover the facts constituting the violation. In consequence, there is nothing in the history of these prior bills of any present materiality, except that there is no suggestion therein that Congress intended to preclude the application of the doctrine of fraudulent concealment.

We shall refer briefly to the legislative history of H.R. 4954, the bill that was finally enacted into law. During the debates in the House, the following colloquy occurred between Congressman Celler and Congressman Patman:

"Mr. PATMAN. Does that 4 years apply to conspiracy cases? Suppose there is a conspiracy, and it is 10 years before the conspiracy is known.

"Mr. CELLER. In the case of conspiracy or fraud, the statute only runs from the time of discovery.

"Mr. PATMAN. From the time of the discovery?

"Mr. CELLER. In conspiracy cases and cases of fraud.

"Mr. PATMAN. And it is not the object or intention to change that at all?

"Mr. CELLER. That is correct." [101 Cong.Rec. 5129 (1955)]

Mr. Celler made substantially the same statement at least twice later during the House discussions of H.R. 4954. 101 Cong.Rec. 5130, 5132–5133 (1955).

The sponsor of the bill was Congressman Celler, who, as Chairman of the House Judiciary Committee, had been an active participant in the six-year effort to have this amendment to the Clayton Act enacted. His views are not to be lightly disregarded. Schwegmann Bros. v. Calvert Corp., 341 U.S. 384, 395, 71 S.Ct. 745, 95 L.Ed. 1035 (1951).

These same House debates establish beyond all doubt that Congress intended § 4B as a "procedural" limitation rather than a "substantive" limitation. 101 Cong.Rec. 5131 (1955):

"Mr. MURRAY of Illinois. Then am I correct in assuming that this limitation provided by this amendment is strictly a procedural limitation and has nothing to do with substance?

"Mr. QUIGLEY. It was the specific purpose of the committee in reporting this bill to in no way affect the substantive rights of individual litigants. It is simply a procedural change and suggested with the thought of setting up a uniform statute of limitations. That is the sole purpose."

A thorough study of the legislative history impels us to the conclusion that it was the intent of Congress that the limitations provision in § 4B be construed in the same manner as had the state stat-

utes of limitations, i. e., as purely a statute of repose, affecting no substantive rights, and subject to the well-settled doctrine of fraudulent concealment.

A supplemental brief filed on behalf of defendant I-T-E Circuit Breaker Company urges, in substance, what we take to be the so-called "plain meaning rule." That rule obviously has no application here, since it must be understood to be subject to the qualification that the federal concealment doctrine "is read into every federal statute of limitations." Holmberg v. Armbrecht, 327 U.S., at p. 397, 66 S.Ct. at p. 585.

Prior to the enactment of § 4B, there was no federal statute of limitations governing private treble damage actions under § 4 of the Clayton Act. State statutes of limitations controlled. We think it clear, and several Courts have so held, that § 4B applies to cases filed after January 7, 1956 (the effective date of the section), whatever the date of accrual of the cause of action. Section 4B provides that no cause of action barred "under existing law" on the effective date of the section shall be revived by that section. It may be necessary, therefore, when evidence is presented, to look to state law to determine whether TVA's causes of action were so barred.

The question posed by defendants' motions has been before several District Courts in the past few months, and the conclusions reached have varied. In the course of extensive research of the law on this issue, we have reviewed all of the available opinions and orders in these cases.

We conclude that, upon a proper showing, the federal doctrine of fraudulent concealment tolls the running of the statute of limitations contained in § 4B of the Clayton Act.

Defendants' motions for partial summary judgment against the United States and TVA with respect to all Clayton Act claims accruing more than four years prior to the filing of the complaint, will be denied.

Defendants' motions for partial summary judgment against the United States as to all claims under the False Claims Act accruing more than six years prior to the filing of the complaint, will be granted.