### In re URANIUM INDUSTRY ANTITRUST LITIGATION.

### No. 342.

Judicial Panel on Multidistrict Litigation.

July 31, 1978.

Edward Weinfeld, J., filed an opinion concurring in part and dissenting in part in which Roy W. Harper, J., joined.

## OPINION AND ORDER

Before JOHN MINOR WISDOM, Chairman, and EDWARD WEINFELD, EDWIN A. ROBSON, JOSEPH S. LORD, III, STANLEY A. WEIGEL, ANDREW A. CAFFREY, and ROY W. HARPER, Judges of the Panel.

STANLEY A. WEIGEL, Judge of the Panel.

## I. BACKGROUND

This litigation consists of four actions pending in the following federal districts: the Northern District of Illinois, the Southern District of New York, the District of Colorado and the Eastern District of Tennessee. Each action involves an alleged conspiracy to increase the price of uranium and to divide portions of the world uranium market.

The Illinois action was filed by Westinghouse Electric Corporation (Westinghouse) on October 15, 1976 against twelve foreign and seventeen domestic companies alleged to be producers, sellers, or agents for sellers of uranium.[1]

The New York, Colorado and Tennessee actions were filed by the Tennessee Valley Authority on November 18, 1977 (TVA actions). The complaints in these three actions contain virtually identical allegations, but the defendants are different. Ten foreign and three domestic companies allegedly engaged in various aspects of the uranium business are named as defendants. The named defendants in each action are listed as co-conspirators in the other actions. Ten of the thirteen defendants in the TVA

---

1. The district court in the Northern District of Illinois found some of the foreign defendants in default for failing to file answers to Westinghouse's complaint.

actions are also named as defendants in the Illinois action; three of these defendants, however, are apparently among the defendants against which default judgments have been entered in the Illinois action. See note 1, *supra*.

## Illinois Action

The complaint in the Illinois action alleges that, beginning in 1972, certain of the foreign defendants formed a cartel that rigged bids, fixed prices and divided portions of the world uranium market. Westinghouse also charges that the foreign defendants urged domestic producers to drop their opposition to removal of the United States Atomic Energy Commission (AEC) embargo on the importation of uranium for enrichment and use in domestic nuclear reactors by promising not to permit sales of foreign uranium into the United States at prices below those prevailing in the United States. The complaint further alleges that the foreign defendants invited and secured the participation of the domestic defendants in the cartel. The complaint alleges that the defendants thereafter cooperated in causing the price of uranium in the United States to be determined by or heavily influenced by the price fixed by the cartel. In addition, the complaint alleges, the defendants agreed to boycott resellers of uranium, including Westinghouse, with the express intent of eliminating those resellers as competitors. Westinghouse claims that these activities violated Section 1 and/or Section 8 of the Sherman Act, and seeks treble damages and injunctive relief.[2]

Several defendants in the Illinois action have filed counterclaims against Westinghouse in which those defendants allege that Westinghouse has violated the antitrust laws by, *inter alia*, (1) monopolizing or attempting to monopolize the market for nu-

clear reactors and nuclear reactor fuel supplies; (2) tying its sale of uranium to its sale of nuclear reactors and fuel assemblies; and (3) entering exclusive dealing contracts with utilities.

In early 1977, certain defendants moved to disqualify Westinghouse's counsel in the Illinois action. On January 25, 1977, the Honorable Prentice H. Marshall, to whom the Illinois action has been assigned, stay discovery as to those movants. Thereafter, Westinghouse retained additional counsel in order to pursue pretrial endeavors while the disqualification issue was being resolved. On July 25, 1978, the Court of Appeals for the Seventh Circuit ruled that, with respect to three defendants in the Illinois action, Westinghouse's original counsel was engaged in a conflict of interest, and that Westinghouse must either discharge this counsel or dismiss the claims against these three defendants. *Westinghouse Electric Corp. v. Kerr-McGee Corp. et al.*, 580 F.2d 1311 (7th Cir. 1978). Westinghouse has stated that it intends to file a petition with the Seventh Circuit for a rehearing en banc on the disqualification issue. "Company News," N.Y. Times, July 27, 1978, at D4, col. 5.

## TVA Actions

In the first two counts of each complaint in the TVA actions, TVA alleges that, beginning in 1972, the defendants and their co-conspirators, in violation of Sections 1 and/or 8 of the Sherman Act, conspired to rig bids, to fix the price, terms and conditions for the sale of uranium, and to allocate uranium sales in foreign and domestic markets. In furtherance of this conspiracy, the defendants allegedly boycotted certain power systems, including TVA, or dealt with those power systems only at prices and

**2.** On May 9, 1978, the Department of Justice filed a misdemeanor information in the Western District of Pennsylvania against Gulf Oil Corporation, one of the defendants in the Illinois action. The information charges that, in violation of Section 1 of the Sherman Act, Gulf conspired with several unnamed co-conspirators (1) to establish prices, terms and conditions of sale under which Gulf and the co-con-

spirators would sell uranium to United States resellers of uranium; (2) to refuse to sell uranium to United States resellers of uranium except at discriminatorily high prices, for the purpose of eliminating competition by such entities; and (3) to refuse to sell uranium to Westinghouse in order to eliminate Westinghouse as a competitor in the sale of uranium.

on terms and conditions fixed by the defendants. More specifically, TVA charges that defendants' conspiratorial activities affected three contracts for the purchase of uranium entered into by TVA in 1974, after the AEC had proposed a gradual relaxation of the embargo on the importation of uranium for enrichment and use in domestic nuclear reactors.

In the third count of each complaint, TVA alleges that the conduct of the defendants violated certain duties owed to TVA under, *inter alia,* Section 21(c) of the Tennessee Valley Authority Act of 1933, *as amended,* 16 U.S.C. § 831t(c).[3]

The Illinois action was previously considered by the Panel for transfer and inclusion under 28 U.S.C. § 1407 in *In re Westinghouse Electric Corporation Uranium Contracts Litigation* (MDL–235). In MDL–235, the Panel, pursuant to Section 1407, centralized several actions involving uranium supply contracts between Westinghouse and a number of utility companies, including TVA, in the Eastern District of Virginia for coordinated or consolidated pretrial proceedings. *In re Westinghouse Electric Corporation Uranium Contracts Litigation,* 405 F.Supp. 316 (Jud.Pan.Mult. Lit.1975). The Panel denied transfer of the Illinois action to the Eastern District of Virginia for inclusion in MDL–235 for the following reasons:

> While we recognize that the allegations of a uranium price-fixing and market manipulation conspiracy in [the Illinois action] and the actions in MDL–235 involve common questions of fact, on the basis of the record before us we are not convinced that these conspiracy issues predominate over the contractual issues that form the basis of MDL–235. . . . In any event, unlike [the Illinois action] . . .

trial is imminent in the actions in MDL–235. Under these circumstances, we believe that the purposes of Section 1407 can best be achieved by allowing the actions in MDL–235 to be left alone. *See In re Celotex Corporation "Technifoam" Products Liability Litigation,* 68 F.R.D. 502, 505 (Jud.Pan.Mult.Lit.1975).

*In re Westinghouse Electric Corporation Uranium Contracts Litigation,* 436 F.Supp. 990, 995–96 (Jud.Pan.Mult.Lit.1977).[4]

Only limited pretrial proceedings have taken place in the TVA actions.

## II. PROCEEDINGS BEFORE THE PANEL

Westinghouse and three defendants in the Illinois action, who are also defendants and co-conspirators in the TVA actions, move the Panel to transfer the TVA actions to the Northern District of Illinois for coordinated or consolidated pretrial proceedings with the Illinois action. TVA, two companies that are defendants and co-conspirators in the TVA actions, and two companies that are defendants in only the Illinois action[5] either move for or support centralization of only the TVA actions in either the Southern District of New York or the Eastern District of Tennessee. Only Urangesellschaft mbH & Co. KG (Urangesellschaft), a defendant and co-conspirator in the TVA actions, opposes centralization of those actions.

## III. DECISION OF THE PANEL

 We find that these four actions involve common questions of fact and that transfer of the three TVA actions to the Northern District of Illinois for coordinated or consolidated pretrial proceedings with the Illinois action will serve the convenience

---

3. This statute states:

 Any person who shall receive any compensation, rebate, or reward, or shall enter into any conspiracy, collusion, or agreement, express or implied, with intent to defraud the Corporation or wrongfully and unlawfully to defeat its purposes, shall, on conviction thereof, be fined not more than $5,000 or imprisoned not more than five years, or both.

4. Trial in MDL–235, including the claims between TVA and Westinghouse, commenced on September 12, 1977 and is still in progress.

5. These two defendants represent that they have been advised by counsel for eight additional domestic defendants involved in only the Illinois action that those eight defendants also oppose transfer of the TVA actions to the Northern District of Illinois.

of the parties and witnesses and promote the just and efficient conduct of the litigation.

### A. Centralization of the TVA Actions

■ Urangesellschaft argues that the Panel is prohibited from transferring any of the TVA actions by Section 1407(g), which states in pertinent part: "Nothing in this section shall apply to any action in which the United States is a complainant arising under the antitrust laws." Urangesellschaft contends that since TVA is a federal agency, the United States is in effect the plaintiff in the TVA actions. Urangesellschaft further contends that the organization of TVA as a government corporation does not detract from TVA's status as a federal agency.

TVA concedes that it is a government corporation and, for some purposes, an agency of the United States. *See, e. g.,* 16 U.S.C. § 831r. TVA contends, however, that it is an entity separate and distinct from the United States for the purpose of suing as a plaintiff under the antitrust laws, and hence does not fall within the ambit of the Section 1407(g) exclusion.

Urangesellschaft opposes, in particular, Section 1407 transfer of the claims against it in the New York action. Urangesellschaft contends that, unlike the other defendants in the TVA actions, it is merely a "middleman," [6] and that the facts and theories upon which TVA may attempt to proceed against Urangesellschaft will differ from those asserted against the defendant producers or agents for sellers. Urangesellschaft also maintains that the scope of discovery on claims asserted against it is likely to be substantially different from that on claims against the other defendants. Moreover, it fears that resolution of the claims against it will be unduly delayed if they are included in Section 1407 proceedings.

We find none of these arguments persuasive. For the purpose of Section 1407(g), TVA clearly is not the equivalent of "the United States [as] a complainant [under] the antitrust laws." Therefore Section 1407(g) does not prevent transfer of TVA's antitrust claims.[7]

In *United States v. General Electric Co.,* 209 F.Supp. 197 (E.D.Pa.1962), an action to recover damages under the antitrust laws, the district court, *inter alia,* considered whether TVA was a "person" entitled to sue within the meaning of 15 U.S.C. § 15,[8] or whether TVA should have brought its action under 15 U.S.C. § 15a,[9] authorizing the United States to sue for damages under the antitrust laws. Defendants in *General Electric* contended that after the enactment of 15 U.S.C. § 15a TVA was precluded from asserting any rights under 15 U.S.C. § 15, on the ground that TVA was an integral part of the United States Government. The court in *General Electric* pointed out that 15 U.S.C. § 15a was specifically enacted to overcome the Supreme Court's deci-

---

6. Urangesellschaft states in its answer to the New York complaint and in papers before the Panel that Urangesellschaft was organized at the suggestion of the West German Government to supply natural uranium to West German nuclear power plants. Urangesellschaft denies that it has ever functioned as a producer or agent for a seller of uranium, and states that it has purchased from producers located in different countries all the uranium that it sells or offers for sale to its customers.

7. Since the third count of each TVA complaint is not brought under the antitrust laws, Section 1407(g) is clearly inapplicable to those counts.

8. 15 U.S.C. § 15 states:

Any *person* who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. (Emphasis added.)

9. 15 U.S.C. § 15a states:

Whenever the United States is hereafter injured in its business or property by reason of anything forbidden in the antitrust laws it may sue therefor in the United States district court for the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover actual damages by it sustained and the cost of [the] suit.

sion in *United States v. Cooper Corporation,* 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071 (1941), where it was inferentially held that the United States is not a "person" within the meaning of 15 U.S.C. §§ 12 and 15, and therefore could not bring suit for damages under the federal antitrust laws.[10] The court in *General Electric* held that TVA is a "person" within the meaning of 15 U.S.C. § 15, that TVA is *distinct* from the United States for the purpose of bringing suit under that statute, and that TVA "may sue for treble damages under [that statute]." *General Electric, supra,* 209 F.Supp. at 205, 207. The court noted, *inter alia,* that 15 U.S.C. § 12 specifically defines a "person" as used in 15 U.S.C. § 15 to include "corporations . . . existing under or authorized by the laws of . . . the United States . . . ." The court reasoned:

> The amendment [15 U.S.C. § 15a] relates only to the United States. Its language is clear and unambiguous and requires no construction. We find nothing in the language of the amendment, or in its legislative history, to support the contention if a repeal by implication of [15 U.S.C. § 15], insofar as that section conferred a right of action on TVA.

*General Electric, supra,* 209 F.Supp. at 207.

■ As all parties recognize, the TVA actions involve numerous complex common questions of fact concerning the conspiracy allegations in TVA's complaints. Centralization of those actions in a single district under Section 1407 is necessary to eliminate duplication of discovery and prevent inconsistent pretrial rulings. The fact that Urangesellschaft is a middleman and not a producer of uranium does not warrant the exclusion of the claims against it from transfer under Section 1407. TVA alleges that Urangesellschaft is involved in the conspiracy. Accordingly, Urangesellschaft's liability may rest on information, if any, concerning the elements of the alleged conspiracy, exchanged between it and the other

defendants. Hence, discovery involving Urangesellschaft is tied to discovery of the other defendants. *See In re Airport Car Rental Antitrust Litigation,* 448 F.Supp. 273, 275–76 (Jud.Pan.Mult.Lit.1978). Of course, Urangesellschaft need not participate in pretrial proceedings unrelated to the claims against it, *see, e. g., Manual for Complex Litigation,* Parts I and II, §§ 2.31 (rev. ed. 1977).

### B. Centralization of the TVA Actions with the Illinois Action

The parties opposing inclusion of the Illinois action in Section 1407 proceedings with the TVA actions contend that while the TVA actions involve a basically foreign conspiracy adversely affecting TVA, and violations of TVA's rights under the Tennessee Valley Authority Act of 1933, the Illinois action primarily concerns participation by domestic firms in the foreign conspiracy to the injury of Westinghouse. Their argument is that while the Illinois action and the TVA actions may share some factual and legal issues, the Illinois action involves too many additional parties, claims, counterclaims and defenses, not involved in the TVA actions, to justify its inclusion in the Section 1407 proceedings.

We disagree. The record before us reveals that the complaints in the TVA actions and the complaint in the Illinois action involve substantial common allegations of conspiratorial activity. For example, all four complaints (1) allege that a conspiracy within the uranium industry was commenced in early 1972 and continued until at least 1974; (2) specifically name the same ten companies among the participants in a conspiracy; (3) contain identical lists of prices allegedly agreed upon; (4) allege that these prices and certain other terms of a conspiracy were agreed upon at meetings held in, *inter alia,* Paris, France; Johannesburg, South Africa; Sydney and Canberra,

---

**10.** The actual holding in *Cooper* was that the term "person," as used in Section 7 of the Sherman Act, 15 U.S.C. § 7, does not include the United States and that the United States is not a "person" entitled to bring an action for treble damages. *Pfizer, Inc. v. Government of India,* 434 U.S. 308, 315, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978); *Cooper, supra,* 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071; *General Electric, supra,* 209 F.Supp. at 203.

Austrialia; and Las Palmas, Canary Islands; and (5) allege that defendants established a "Secretariat" to maintain records and carry out day-to-day administration of the conspiracy. Clearly these four actions share numerous complex factual questions concerning, *inter alia*, whether there was a domestic and/or international conspiracy in the uranium industry; and if there was, who participated in the conspiracy; what the purposes of the conspiracy were; how the participants attempted to effectuate those purposes; and what the actual effects of the conspiracy were. Centralization of the Illinois and TVA actions is necessary to prevent duplicative discovery, eliminate any possibility of conflicting pretrial rulings and conserve time and effort for the parties, the witnesses and the judiciary. Discovery on any issues unique to any action, group of actions or party may be scheduled by the transferee judge to proceed in a separate discovery schedule concurrently with discovery on common issues. *See In re Corrugated Container Antitrust Litigation*, 447 F.Supp. 468, 471 (Jud.Pan.Mult.Lit.1978).

The international aspects of this litigation greatly increase the complexity of the factual and legal questions and the discovery problems. According to the parties, most of the discovery from the numerous foreign defendants will have to be conducted abroad. We are aware that in both the Illinois action and MDL–235, Westinghouse has encountered substantial opposition and difficulty in its attempts to discover materials and depose parties and witnesses located outside the country. *See, e. g., In re Westinghouse Electric Corporation Uranium Contracts Litigation*, 563 F.2d 992 (10th Cir.

1977); Canadian Uranium Information Security Regulations, SOR, 76–644 (P.C. 1976–2368, Sept. 21, 1976), promulgated pursuant to Canada's Atomic Energy Control Act, R.S.C.1970, c. A19;[11] Foreign Proceedings (Prohibition of Certain Evidence) Act, No. 121 of 1976 (Australia); "Rio Tinto Exempted From Testifying In Uranium Case," Wall St.J., Dec. 2, 1977, at 36, col. 4; Auerbach, "U.S. to Pursue Antitrust Probes Abroad," Wash.Post, Aug. 9, 1977, at A2, col. 1. These additional discovery problems make centralization of the Illinois and TVA action especially appropriate.

TVA also strenuously argues that TVA and Westinghouse cannot and should not be forced to act as co-plaintiffs in Section 1407 proceedings because they are antagonistic parties in the uranium contracts litigation, MDL–235. The argument, often made to us in like situations and rejected by us, is without merit. The antagonism calls for the guiding hand of a transferee judge to ensure that it does not generate, as it otherwise would, unnecessary, duplicative and cumbersome discovery.

TVA maintains that its view of the effects and focus of the alleged conspiracy, both in MDL–235 and in the actions now before the Panel, is quite different from that of Westinghouse. Therefore, TVA contends that forcing TVA and Westinghouse to act as co-plaintiffs in the Illinois and TVA actions would not promote cooperation among the parties, judicial convenience or efficiency, or the interests of justice. TVA contends that any necessary or desirable coordination of discovery or other pretrial proceedings between the TVA and

**11.** These Regulations provide, in pertinent part, as follows:

No person who has in his possession or under his control any note, document or other written or printed material in any way related to conversations, discussions or meetings that took place between January 1, 1972 and December 31, 1975 involving that person or any other person or any government, crown corporation, agency or other organization in respect of the production, import, export, transportation, refining, possession, ownership, use or sale of uranium or its derivatives or compounds, shall

(a) release any such note, document or material, or disclose or communicate the contents thereof to any person, government, crown corporation, agency or other organization unless
(i) he is required to do so by or under a law of Canada, or
(ii) he does so with the consent of the Minister of Energy, Mines and Resources; or
(b) fail to guard against or take reasonable care to prevent the unauthorized release of any such note, document or material or the disclosure or communication of the contents thereof.

Illinois actions can be obtained by informal coordination among the courts, parties and counsel involved.

■ We reject TVA's contention that the presence of antagonism between TVA and Westinghouse militates against transfer.[12] TVA and Westinghouse will have to depose many of the same witnesses, examine many of the same documents, and make many similar pretrial motions in order to prove their conspiracy allegations. The benefits of having a single judge supervise this pretrial activity are obvious. In other multidistrict dockets we have repeatedly held, as we do here, that antagonistic interests among the parties may be accommodated by the transferee judge, who, from day-to-day contact with all aspects of the litigation, will be in the best position to protect the rights of all concerned, while at the same time streamlining the pretrial process. *See, e. g., In re Corrugated Container Antitrust Litigation, supra,* 447 F.Supp. at 471 (in a group of related actions, parties were defendants in most actions and members of a purported plaintiffs' class in another action); *In re Sugar Industry Antitrust Litigation,* 437 F.Supp. 1204, 1206–08 (Jud.Pan. Mult.Lit.1977) (in a group of related actions, a party was a defendant in some actions and a member of a plaintiffs' class in other actions).

TVA maintains, on the one hand, that antagonism between TVA and Westinghouse would hinder centralized pretrial proceedings, and on the other, that voluntary cooperation among the parties is a suitable alternative to Section 1407 proceedings. We have difficulty giving much weight to this argument. Assuming that TVA and Westinghouse are antagonists, the prospects for informal voluntary cooperation on discovery and other pretrial matters are not promising. Proceedings pursuant to Sec-

tion 1407 offer the advantage of determination and enforcement by the transferee judge of the extent of coordination or consolidation of pretrial proceedings in the transferred actions. Thus the presence of antagonism among the parties underscores the need to put all the actions under the supervision of a single judge.

Our Brother Weinfeld, dissents from our decision to include the Illinois action in coordinated or consolidated pretrial proceedings with the three TVA actions. He believes the problems presented by (1) the antagonism between Westinghouse and TVA, (2) the complexity produced by counterclaims in the Illinois action, and (3) the threat of delay during the resolution of the motions to disqualify Westinghouse's counsel in the Illinois action would prevent Section 1407 proceedings from serving the convenience of the parties and witnesses or promoting the just and efficient conduct of the litigation. Thus he concludes that the coordination or consolidation of the pretrial proceedings would unfairly submerge the interests of TVA in the claims and counterclaims of the Westinghouse controversy.[13]

Earlier, we expressed our view that the antagonism between the parties militates for rather than against the coordination and consolidation of the pretrial proceedings of the Illinois and TVA actions. See p. 1230, *supra.*

■ Similarly we have concluded that the presence of claims and counterclaims, unrelated to the TVA actions, in the Illinois action does not militate against transfer under Section 1407. The crux of these actions is the allegation of a domestic and/or foreign conspiracy in the uranium industry. Centralization of the Illinois and TVA actions is necessary to prevent duplication in the extensive and difficult discovery expected on this key issue. It is necessary

---

**12.** The Panel notes that TVA must face the problems, it any, posed by any inconsistency between its position in the MDL–235 contracts litigation and that in this litigation, in any event.

**13.** Since we conclude that the transferee judge has both the means and the authority to handle

any antagonism between the parties, any complications caused by issues unique to a particular action and any threatened delay, we do not consider our Brother's implication that, because TVA is for some purposes a federal agency, actions brought by it are entitled to preferential treatment.

also, we are satisfied, to forestall the delays which might well result from counsel undertaking to play one district court against another based upon claims of conflicts in scheduling discovery. See pp. 1228–1229, *supra.*

■ Finally, we have concluded that our Brother's fear that pretrial progress in the TVA actions will be delayed is unwarranted. The transferee judge has the means and authority to prevent any unreasonable delay in the pretrial proceedings of this litigation. For example, during consideration of the disqualification of counsel motions, discovery was stayed only as to the movants and Westinghouse retained additional counsel in order to proceed with pretrial matters.

Even if the proceedings in the Illinois action are stayed as to some parties, discovery can continue. Parties in the TVA actions will be able to make use of any discovery already accomplished in the Illinois action; when any stayed proceedings in the Illinois action resume, the parties involved may be able to use discovery conducted in their absence to quickly catch up in the pretrial proceedings. *See Manual for Complex Litigation,* Parts I & II, §§ 3.11 (rev. ed. 1977); *In re South Central States Bakery Products Litigation,* 433 F.Supp. 1127, 1130 (Jud.Pan.Mult.Lit.1977); *In re Olympia Brewing Co. Antitrust Litigation,* 415 F.Supp. 398, 401 (Jud.Pan.Mult.Lit. 1976). *See also Manual for Complex Litigation,* Parts I & II, §§ 2.31 (rev. ed. 1977) (opportunity for delayed examination by parties unable to attend all depositions may be provided).

Moreover, proper scheduling of any discovery on issues unique to particular actions or parties during any hiatus may eliminate any delay in the prosecution of the litigation. Thus, in the long run, transfer of these actions under Section 1407, together with careful management by the transferee judge, will expedite the pretrial proceedings, further the convenience of the parties and witnesses, and promote the just and efficient conduct of the actions.

■ Transfer of the TVA actions to the Northern District of Illinois does not mean that the TVA actions and the Illinois action are now merged. Rather, the relationship between the TVA actions and the Illinois action in the conduct of the Section 1407 proceedings is entirely within the discretion of the transferee judge.

The statute speaks in terms of transfer to 'any district for coordinated or consolidated pretrial proceedings.' 28 U.S.C. § 1407(a). Used in the disjunctive, the critical words denote different judicial functions. They are indicative of the flexibility and resourcefulness implicit in the legislation. They were undoubtedly intended to confer on a transferee judge the power to fashion the discovery program to accommodate the different facets and nuances of the litigation. It is the province of the Panel to decide whether in the first instance the litigation should be *transferred* for coordinated or consolidated pretrial proceedings. It is the province of the transferee judge to determine whether and to what extent the pretrial proceedings should be coordinated or consolidated. We have repeatedly declined to attempt to determine in what way and to what extent the litigation should be coordinated or consolidated. From the very beginning we have left that determination to the discretion of the transferee judge.

*In re Equity Funding Corporation of America Securities Litigation,* 375 F.Supp. 1378, 1384 (Jud.Pan.Mult.Lit.1974).

We also find the following remarks, included in the concurring opinion in *Equity Funding, id.* at 1388, 1391, to be particularly apt here:

The majority decision in this litigation is founded on confidence, rather than fears as suggested in the minority opinion. The confidence on which it is founded is confidence in the transferee judge, repeatedly justified by prior experience of the Panel.

There is confidence that the transferee judge will grant all reasonable requests for priority in discovery. *See, e. g., In re*

*IBM Antitrust Litigation,* 319 F.Supp. 926 (Jud.Pan.Mult.Lit.1970). Arguments and pessimistic prophecies similar to those in the minority opinion have been made repeatedly before the Panel and disproved later by experience. The same dire predictions of delay were made by the minority in the *Yarn Processing Patent Litigation* decision reported at 341 F.Supp. 376 (Jud.Pan.Mult.Lit.1972), and dispelled by subsequent events.

In the exceedingly complex *IBM Antitrust Litigation* the less complex and *Greyhound Computer* actions were transferred under Section 1407 to the District of Minnesota and assigned to the late able Honorable Philip Neville, United States District Judge. *In re IBM Antitrust Litigation,* 342 F.Supp. 200 (Jud. Pan.Mult.Lit.1972); *In re Multidistrict Private Civil Treble Damage Litigation Involving IBM,* 319 F.Supp. 926 (Jud.Pan. Mult.Lit.1970). Proper priority in discovery was given to the less complex cases, after which they were transferred or remanded and swiftly tried . . . without awaiting completion of discovery in the more complex actions. *See Greyhound Computer Corp. v. IBM,* 342 F.Supp. 1143 (D.Minn.1972). These examples of efficient administration by a transferee judge make it evident that imagined difficulties may be easily avoided.[14]

The Northern District of Illinois is clearly the most appropriate transferee forum. Judge Marshall has had an opportunity to become acquainted with the complicated nuances of this litigation and thus is in the best position to supervise the pretrial proceedings. *See In re Griseofulvin Antitrust Litigation,* 395 F.Supp. 1402, 1403 (Jud.Pan. Mult.Lit.1975).

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions listed on the following Schedule A and pending in districts other than the Northern District of Illinois be, and the same hereby are, transferred to the Northern District of Illinois and, with the consent of that court, assigned to the Honorable Prentice H. Marshall for coordinated or consolidated pretrial proceedings with the action already pending there and listed on Schedule A.

### SCHEDULE A

| | Civil Action No. |
|---|---|
| **District of Colorado** | |
| Tennessee Valley Authority v. Rio Algom Corp. | 77–Z–1053 |
| **Northern District of Illinois** | |
| Westinghouse Corp. v. Rio Algom Limited, et al. | 76C3830 |
| **Southern District of New York** | |
| Tennessee Valley Authority v. Urangesellschaft mbH & Co. KG, et al. | 77–Civ–5617 |
| **Eastern District of Tennessee** | |
| Tennessee Valley Authority v. Rio Algom Ltd., et al. | 77–290 |

EDWARD WEINFELD, Judge of the Panel, with whom ROY W. HARPER, Judge of the Panel, joins (concurring in part and dissenting in part):

I concur in the decision of my brethren that the three TVA actions should be centralized in a single district pursuant to 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings. I dissent, however, from that part of the opinion which includes the Illinois action in coordinated or consolidated pretrial proceedings with the three TVA actions. I would allow the three TVA actions to proceed in coordinated or consolidated pretrial proceedings separate from the Illinois action in a district other than the Northern District of Illinois.

The interests of Westinghouse and TVA are antagonistic in MDL–235 (uranium contract actions) and in MDL–342 (uranium conspiracy actions). In the uranium contract actions, one of which has been brought by TVA, several utility companies allege that Westinghouse breached its contractual obligations for the present and/or

14. We note that although *Equity Funding* was extremely complicated, it was in great part resolved in a relatively short time period because of the ingenuity, perseverance and herculean efforts of the Honorable Malcolm M. Lucas (the transferee judge) and the Honorable William Matthew Byrne, Jr. (who served as a settlement judge). *See In re Equity Funding Corporation of America,* 438 F.Supp. 1303, 1313–21 (C.D.Cal.1977).

future delivery of uranium to fuel nuclear power plants. Westinghouse has pled as its defense in these actions that full performance of its contractual obligations for the supply of uranium became "commercially impracticable" by reason of unforeseen developments and that Westinghouse was accordingly excused from such performance by reason of Section 2–615 of the Uniform Commercial Code. One of the principal unforeseen developments that Westinghouse has raised during pretrial and the ongoing trial of those actions has been the alleged illegal conspiracy among foreign and domestic uranium producers to manipulate the price and availability of uranium, which is also the basis of the Illinois action now before the Panel. Westinghouse asserts that proof of this conspiracy might establish its defense in the uranium contract actions and also entitle Westinghouse to relief in the Illinois uranium conspiracy action. To expect Westinghouse and TVA to cooperate effectively in attempting to prove a conspiracy that Westinghouse is asserting as a defense to the uranium contract claims instituted by TVA is unrealistic. The views of Westinghouse and TVA concerning the focus and effects of this alleged conspiracy are clearly in substantial conflict.

The counterclaims which have been filed in the Illinois action add a further dimension of complexity to the already labyrinthian proceedings in that action. The numerous issues raised by those counterclaims do not involve any interests of TVA. They will entangle the litigants in a variety of disputes concerning the propriety of Westinghouse's marketing practices with respect to nuclear reactors and fuel supplies for nuclear reactors. For example, Gulf Oil Corporation (Gulf), one of the counterclaimants, charges that Westinghouse attempted to eliminate from the market a competing nuclear reactor designed and manufactured by Gulf. Specifically, Gulf alleges that Westinghouse (1) refused to supply to Gulf at reasonable prices electric generators to be used in Gulf's nuclear reactor system, (2) unfairly disparaged the design of the nuclear reactor system marketed by Gulf, (3) submitted unreasonably low bids for nuclear reactor systems while at the same time deliberately concealing substantial financial losses on nuclear business, and (4) sold at commercially unmatchable prices supplies of uranium which Westinghouse did not have in its possession as part of a total package in which Westinghouse's nuclear reactor systems were also sold.

Furthermore, pretrial proceedings in the Illinois action have been delayed substantially during the resolution of the motions to disqualify Westinghouse's original counsel in that action. Westinghouse's substitute counsel stated during oral argument before the Panel that Westinghouse will press for retention of its initial counsel because that counsel is extremely knowledgeable about Westinghouse's position in this litigation and Westinghouse will save time and money by not having to reeducate new counsel. Therefore, further delay of pretrial progress in the Illinois action is likely.

In light of these circumstances, I do not believe that coordinated or consolidated pretrial proceedings between the Illinois uranium conspiracy action and the three TVA uranium conspiracy actions would serve the convenience of the parties and witnesses or promote the just and efficient conduct of the litigation. Moreover, TVA is an arm of the federal government that serves the public interest and it should not be caught in the crossfire of the conflicting positions of the private litigants. TVA is simply attempting to recover damages for injuries it allegedly suffered in connection with the uranium supply contracts specifically enumerated in the TVA complaints and as a result of defendants' alleged breach of certain duties owed to TVA under the Tennessee Valley Authority Act of 1933. These interests should not be submerged by the extensive claims and counterclaims that are inherent in the various Westinghouse controversies with other litigants. I am thus of the view that the TVA actions will be able to proceed toward trial more expeditiously if they are allowed to proceed separately from the Illinois action in a district other than the Northern District of Illinois.