466 F.Supp. 958 (1979)
In re URANIUM INDUSTRY ANTITRUST LITIGATION.
Homestake Mining Corp.
v.
Enerdyne Corp., D. New Mexico, C.A. No. 77-609 P.
No. 342.
Judicial Panel on Multidistrict Litigation.
February 27, 1979.
Before MURRAY I. GURFEIN, Chairman, and EDWIN A. ROBSON, STANLEY A. WEIGEL, ANDREW A. CAFFREY, ROY W. HARPER, and CHARLES R. WEINER, Judges of the Panel.

OPINION AND ORDER
PER CURIAM.

I. BACKGROUND

A. The Actions In The Transferee District

On July 31, 1978, the Panel, pursuant to 28 U.S.C. § 1407, transferred three actions (the TVA actions) to the Northern District of Illinois and, with the consent of that court, assigned them to the Honorable Prentice H. Marshall for coordinated or consolidated pretrial proceedings with a fourth action (Rio Algom) already pending there. In re Uranium Industry Antitrust Litigation, 458 F.Supp. 1223 (Jud.Pan.Mult.Lit. 1978). These four actions involve and alleged conspiracy to increase the price of uranium and to divide portions of the world uranium market.
The complaints in the TVA actions contain virtually identical allegations, but the defendants are different. Ten foreign and three domestic companies allegedly engaged in various aspects of the uranium business are named as defendants. The named defendants in each action are listed as co-conspirators in the other actions. In each complaint in the TVA actions, TVA alleges, inter alia, that beginning in 1972, the defendants and their co-conspirators, in violation of Sections 1 and/or 8 of the Sherman Act, conspired to rig bids, to fix the price, terms and conditions for the sale of uranium, and to allocate uranium sales in foreign and domestic markets.
Rio Algom was filed by Westinghouse Electric Corporation (Westinghouse) against twelve foreign and seventeen domestic companies (including Homestake Mining Company) alleged to be producers, sellers, or agents for sellers of uranium.[1] *959 The complaint in this action alleges that, beginning in 1972, the defendants formed an international cartel that fixed and increased the price of uranium to purchasers within the United States; allocated the sale of uranium; boycotted certain uranium purchasers; and otherwise eliminated competition among the defendants. Westinghouse claims that these activities violated Sections 1 and/or 8 of the Sherman Act.
In the Panel's earlier opinion in this litigation, the Panel found that
these four actions share numerous complex factual questions concerning, inter alia, whether there was a domestic and/or international conspiracy in the uranium industry; and if there was, who participated in the conspiracy; what the purposes of the conspiracy were; how the participants attempted to effectuate those purposes; and what the actual effects of the conspiracy were.
. . . . .
. . . [Thus] [t]he crux of these actions is the allegation of a domestic and/or foreign conspiracy in the uranium industry. Centralization of the Illinois and TVA actions is necessary to prevent duplication in the extensive and difficult discovery expected on this key issue.
Id. at 1229-30.
On September 26, 1978, Judge Marshall entered an order coordinating for pretrial purposes the TVA actions and Rio Algom. Earlier, Judge Marshall had approved a discovery schedule which basically provides that depositions on the merits in this coordinated litigation were to commence in January 1979. This schedule also establishes a trial date in September 1980.

B. Homestake Mining Company's Earlier Action

The Panel has previously considered the question of whether to include in In re Westinghouse Electric Corporation Uranium Contracts Litigation (MDL-235) an action brought by Homestake Mining Co., which is also the plaintiff in the action now before the Panel, against Westinghouse (this action will be referred to as Homestake I). In the Panel's original opinion in MDL-235, the Panel, pursuant to Section 1407, had centralized several actions involving uranium supply contracts between Westinghouse and a number of utility companies, including TVA, in the Eastern District of Virginia for coordinated or consolidated pretrial proceedings. In re Westinghouse Electric Corporation Uranium Contracts Litigation, 405 F.Supp. 316 (Jud.Pan. Mult.Lit. 1975). Homestake I involved the rights and obligations of Homestake and Westinghouse under a 1974 contract by which Homestake agreed to sell 700,000 pounds of uranium to Westinghouse. This contract stated that the source of this uranium would be a contract between Homestake and a French corporation, Uranex, and that Homestake would have no liability to Westinghouse should Uranex fail to make delivery. After Uranex allegedly informed Homestake that Uranex was unable or unwilling to deliver the uranium under their contract, Homestake filed Homestake I against Westinghouse, seeking declaratory and injunctive relief. Basically, Homestake sought a declaration that, because of Uranix's failure or refusal to perform its contract with Homestake, Homestake's obligation to deliver uranium to Westinghouse was terminated. Westinghouse counterclaimed against Homestake in this action for breach of contract and unjust enrichment. In addition, Westinghouse raised the defense of "unclean hands" against Homestake,[2] alleging that Homestake participated in the antitrust conspiracy alleged in Westinghouse's complaint in Rio Algom.
The Panel declined to include Homestake I in MDL-235[3] holding, inter alia, that: *960 although Westinghouse's `unclean hands' defense in Homestake [I] may share questions of fact with Westinghouse's defense in the actions in MDL-235 concerning the allegedly international conspiracy, the issues in Homestake [I] are basically unique to that action because they involve the contractual relationships between Westinghouse and Homestake as well as Homestake and Uranex.
In re Westinghouse Electric Corporation Uranium Contracts Litigation, 436 F.Supp. 990, 995 (Jud.Pan.Mult.Lit. 1977).[4]

C. The Action Now Before The Panel

The action presently before the Panel (Homestake II) arises out of a 1970 agreement between Homestake and Enerdyne Corporation (Enerdyne) whereby Homestake become the assignee of most of Enerdyne's interests under, and the lessee of, certain unpatented mining claims concerning uranium properties located in New Mexico. In September 1977, Homestake filed Homestake II in the District of New Mexico against Enerdyne, seeking a declaration that Homestake's obligations under that agreement had been fully satisfied. Shortly thereafter, Enerdyne filed its answer and counterclaims.[5] The counterclaims assert certain breaches of implied covenants, conditions and duties under the 1970 agreement; misrepresentation by Homestake; lack of good faith, fraud and deceit; constructive fraud; or breach of fiduciary duty. One of Enerdyne's counterclaims also alleges that Homestake conspired with "other uranium producers," in violation of the federal antitrust laws and the antitrust laws of New Mexico, to restrain trade and commerce in uranium. Enerdyne claims that this alleged conspiracy lead Homestake to breach its contractual commitments to Enerdyne.[6]
On September 8, 1978, the district court ordered that all discovery in this action must be completed on or before March 1, 1979. Homestake and Enerdyne have both represented to the Panel, however, that only minimal discovery concerning the antitrust counterclaim has yet occurred in Homestake II. No trial date has yet been established in this action.

II. PROCEEDINGS BEFORE THE PANEL
Homestake has moved the Panel, pursuant to 28 U.S.C. § 1407, to transfer the antitrust counterclaim in Homestake II to the Northern District of Illinois for coordinated or consolidated pretrial proceedings with the four actions already pending there. Enerdyne and Westinghouse oppose this motion. No other parties have responded to Homestake's motion.

III. DECISION OF THE PANEL
We find that the antitrust counterclaim in Homestake II shares questions of fact with the four actions in the transferee district and that inclusion of that counterclaim in the Section 1407 proceedings pending there will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.
Enerdyne contends that the legal and factual issues in Homestake II all arise from the contractual relationship between *961 Homestake and Enerdyne. Each of these issues relates to 1) the negotiations between Enerdyne and Homestake which resulted in the execution of the 1970 agreement between those parties; 2) the nature of the duties imposed upon Homestake by that agreement; and 3) the reasons for the alleged breach by Homestake of its duties under the agreement, Enerdyne asserts. Enerdyne contends that its antitrust counterclaim falls into the last of these categories, because the activities alleged in that counterclaim tend to show why Homestake failed to produce uranium from the mining properties covered by the 1970 agreement. While the antitrust counterclaim may share some questions of fact with the actions in the transferee district, Enerdyne argues, that counterclaim is merely one element in a complex contractual dispute whose resolution will turn primarily upon New Mexico state law dealing with mining obligations and the interpretation of contracts. Enerdyne manintains that its antitrust counterclaim can be most easily understood and most efficiently litigated in the context of that particular contractual dispute.
Westinghouse agrees with Enerdyne that Homestake II basically involves a contractual dispute between Homestake and Enerdyne. Westinghouse further argues that its interpretation of the allegations of the antitrust counterclaim and discovery to date in Homestake II "indicate[s] that any conspiracy alleged therein is substantially and factually distinct from that alleged in either [Rio Algom] or the TVA actions. . . ." Westinghouse points out that the properties subject to the 1970 agreement between Homestake and Enerdyne are located solely in New Mexico, and that the conspiracy involved in the actions in the transferee district allegedly began in 1972, two years after the agreement between Homestake and Enerdyne was entered into. Westinghouse thus asserts that discovery in the transferee district concerning an alleged antitrust conspiracy will involve a plethora of factual questions not raised by Enerdyne's antitrust counterclaim, and that discovery on these issues in the transferee district will dwarf any possible discovery in Homestake II.
Westinghouse also objects to the inclusion of Enerdyne's antitrust counterclaim in the coordinated or consolidated pretrial proceedings pending in Chicago on the grounds that such a transfer would complicate and delay both Homestake II and those coordinated pretrial proceedings. Westinghouse points out that the antitrust counterclaim, unlike Rio Algom or the TVA actions, involves claims under Section 2 of the Sherman Act, and contends that therefore discovery proceedings concerning that counterclaim will involve numerous unique factual inquiries. In addition, Westinghouse maintains that bifurcating Homestake II by transferring the antitrust counterclaim to Chicago and leaving the rest of that action in New Mexico is an inefficient manner by which to process that action. To the extent that discovery in Homestake II and the coordinated proceedings may overlap, Westinghouse suggests that, inter alia, voluntary cooperation among the parties would be sufficient to accomplish the goals of Section 1407 transfer.
Finally, both Westinghouse and Enerdyne claim that the Panel's determination that Homestake I should not be included in MDL-235, In re Westinghouse Electric Corporation Uranium Contract Litigation, supra, 436 F.Supp. at 495, serves as a precedent for denying Homestake's present motion. The issues in the antitrust counterclaim in Homestake II are "basically unique" to the contractual relationship between Homestake and Enerdyne, Enerdyne and Westinghouse argue, and that counterclaim should not be included in the coordinated pretrial proceedings in the transferee district merely because "of a surface similarity presented by one element of a complicated local contract dispute."
We find these arguments unconvincing. While the bare allegations of Enerdyne's antitrust counterclaim are not as detailed as the allegations of the complaints in Rio Algom or the TVA actions, the record before us amply demonstrates that the antitrust counterclaim in Homestake II and the actions already in the transferee district *962 share numerous complex factual questions concerning whether there was a conspiracy in the uranium industry; and if there was, whether Homestake participated in the conspiracy; what the purposes of the conspiracy were; and what the actual effects of the conspiracy were. For example, at a deposition conducted in Homestake II, counsel for Enerdyne explained the relevance of a particular question as follows:
The allegations in the Chicago action allege certain violations of the United States Antitrust Laws and claim that Homestake did conspire with other uranium companies to violate those laws. We have similar allegations against Homestake in this action.
And in responding to an interrogatory propounded by Homestake, Enerdyne stated:
Enerdyne believes the decision by Homestake to restrict the production of uranium from the subject properties was made as part of a conspiracy with Uranex, a foreign cartel company [which is named as a defendant in one of the TVA actions and as a co-conspirator in the remaining two TVA actions and Rio Algom] and perhaps other companies.
Also see Transcript at 3-5.
In addition, it is clear that Enerdyne's allegations in the antitrust counterclaim that "Homestake had deliberately refused to proceed diligently to develop and mine the subject properties, in an effort to withhold uranium from the market and drive up its prices" directly parallels factual issues already raised in the transferee district. In a recent opinion, the Court of Appeals for the Seventh Circuit reversed a decision of the transferee judge in which the judge had refused to disqualify a law firm that represented one of the defendants in the transferee district. The Seventh Circuit held in part as follows:
The lower court erred . . . in identifying the issues raised by an allegation of price fixing . . .. The lower court found that the `heart of the [Westinghouse] complaint is directed at alleges price-fixing arrangements.' 448 F.Supp. at 1312. However, an agreement to restrict the production of uranium unquestionably is a price fixing arrangement. `Price fixing' is a characterization which extends to all conspiracies designed to manipulate the price of goods. [Citations omitted]. In fact, all serious attempts to establish a supracompetitive price must necessarily include an agreement to restrict output. Otherwise the monopoly price could never be maintained. Thus, the lower court's view that conspiracy to fix prices and conspiracy to restrict output are distinct offenses is in error. The lower court's reliance on the fact that the complaint contains only a `few scanty references to the alleged conspiratorial control of uranium production' is misplaced.5
5 The district court cites only a portion of the complaint's references to the constraint issue, e. g., paragraphs 36, 39(b) and 46. The complaint . . . also raises the issue twice in the introduction as well as paragraphs 41(d), 43 and 55(a). Further, Westinghouse continued to raise supply curtailment issues in the course of the litigation in its answer to interrogatories.
448 F.Supp. at 1312. Westinghouse's general allegation of price fixing is sufficient to make evidence tending to establish a conspiracy to restrict uranium production relevant to the litigation.
Westinghouse Electric Corporation v. Gulf Oil Corporation, 588 F.2d 221, 226 (7th Cir. 1978).
We acknowledge that Homestake II concerns in great part a contractual dispute between Homestake and Enerdyne. Nevertheless, we agree with Homestake, the movant before us, that Enerdyne's antitrust counterclaim should be severed from the remaining claims and counterclaims in Homestake II and transferred to the Northern District of Illinois. In fact, even Enerdyne states in its papers before the Panel that "[i]f transfer is deemed necessary . . because of common antitrust issues, the antitrust claims can and should be severed from the other claims stated by the counterclaim." Thus, we are of the view that transfer of only the antitrust counterclaim
is necessary to prevent duplicative discovery, eliminate any possibility of conflicting *963 pretrial rulings and conserve time and effort for the parties, the witnesses and the judiciary. Discovery on any issues unique to any action, group of actions or party may be scheduled by the transferee judge to proceed in a separate discovery schedule concurrently with discovery on common issues. See In re Corrugated Container Antitrust Litigation, 447 F.Supp. 468, 471 (Jud.Pan.Mult.Lit. 1978).
In re Uranium Industry Antitrust Litigation, supra, 458 F.Supp. at 1229.
Inclusion at this time of the antitrust counterclaim in the Section 1407 proceedings now being conducted in the transferee district is particularly appropriate because Judge Marshall has already had an opportunity to become uniquely acquainted with all facets of the discovery and other pretrial proceedings concerning the alleged uranium conspiracy. We are confident that Judge Marshall, with the assistance and cooperation of the parties and counsel, will be able smoothly to integrate Enerdyne's antitrust counterclaim into the pretrial proceedings in the transferee district. See id. at 1231-32; Manual for Complex Litigation, Parts I & II, § 3.11 (rev. ed. 1977). Moreover, this result is manifestly preferable to Westinghouse's suggested alternative of voluntary cooperation among the parties.[7] Should the antitrust counterclaim become ready for trial or otherwise ready for remand because the transferee judge finds that the Section 1407 proceedings pertaining to the counterclaim are completed, the transferee judge may suggest to the Panel that the Panel remand the counterclaim to its transferor court. 28 U.S.C. § 1407(a); Rule 11(c)(ii), R.P.J.P.M.L., 78 F.R.D. 561, 569 (1978). See, e. g., In re A. H. Robins Co., Inc. "Dalkon Shield" IUD Products Liability Litigation, 453 F.Supp. 108 (Jud.Pan.Mult. Lit. 1978).
We discern no inconsistency between our determination concerning the antitrust counterclaim in Homestake II and our earlier decision not to include Homestake I in MDL-235. In our MDL-235 decision, we declined to transfer either Rio Algom or Homestake I to the Eastern District of Virginia, even though both of those actions raised issues concerning an alleged conspiracy in the uranium industry. In re Westinghouse Electric Corporation Uranium Contract Litigation, supra, 436 F.Supp. at 992-93, 995. In denying transfer of Rio Algom, for example, we recognized that "the allegations of a uranium price-fixing and market manipulation conspiracy in Rio Algom and the actions in MDL-235 involve common questions of fact," but we held that "on the basis of the record before us we are not convinced that these conspiracy issues predominate over the contractual issues that form the basis of MDL-235." Id. at 995. The primary reason for our decision not to include either Rio Algom or Homestake I in MDL-235, however, was that, unlike those two actions, trial was imminent in the actions in MDL-235,[8] and we therefore found that "the purposes of Section 1407 [could] best be achieved by allowing the actions in MDL-235 to be left alone. [Citation omitted.]" Id. at 996. That situation is far removed from the one now before us, where trial for any action that will be tried in the Northern District of Illinois is not presently scheduled to commence until September 1980. Finally, as we have already stated, in the present litigation, unlike MDL-235, the common core of factual issues springs from the alleged existence of a conspiracy in the uranium industry, and we are transferring to the Northern District of Illinois only that portion of Homestake II which raises these common questions of fact.
IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the action *964 captioned Homestake Mining Corp. v. Enerdyne Corp., D.New Mexico, C.A. No. 77-609 P, be, and the same hereby is, transferred to the Northern District of Illinois and, with the consent of that court, assigned to the Honorable Prentice H. Marshall for coordinated or consolidated pretrial proceedings with the actions already pending there.
IT IS FURTHER ORDERED that, pursuant to 28 U.S.C. § 1407(a), all claims and counterclaims in this action except the antitrust counterclaim be, and the same hereby are, separated and remanded to the District of New Mexico for further proceedings.
NOTES
[1] The district court in the Northern District of Illinois found some of the foreign defendants in default for failing to file answers to Westinghouse's complaint. Final default judgments as to liability recently were entered against these defendants.
[2] Homestake has advised the Panel that Westinghouse has withdrawn this defense in Homestake I.
[3] The Panel also found that inclusion of Rio Algom in MDL-235 was inappropriate. In re Westinghouse Electric Corporation Uranium Contracts Litigation, 436 F.Supp. 990, 994-96 (Jud.Pan.Mult.Lit.1977).
[4] See further discussion of why Homestake I was not included in MDL-235 at page 963, infra.
[5] Although Enerdyne's pleading is captioned as a "counterclaim," Enerdyne itself acknowledges in its papers before the Panel that its "counterclaim" actually raises numerous counterclaims.
[6] Enerdyne's antitrust counterclaim is stated in §§ 15, 20 and 21 of its "first amended counterclaim," as follows:

15. At times acting independently and at times acting in concert, collusion, and conspiracy with other uranium producers, Homestake had deliberately refused to proceed diligently to develop and mine the subject properties, in an effort to withhold uranium from the market and drive up its prices.
20. Homestake has used the Homestake agreement to withhold and delay production of uranium, in violation of §§ 49-1-2, and 49-1-3, N.M.S.A. (1953 Comp.) [The New Mexico Antitrust Laws].
21. Homestake has used the Homestake agreement to withhold and delay production of uranium, in violation of 15 U.S.C. § 1, 15 U.S.C. § 2, and 15 U.S.C. § 3.
[7] We note that neither Homestake nor Enerdyne has urged that voluntary cooperation is a suitable alternative to Section 1407 transfer.
[8] On October 27, 1978, the transferee judge in MDL-235 found, after a trial limited to issues of liability, that Westinghouse had wrongfully breached its contracts with some of the utility plaintiffs.