### In re FOOD FAIR SECURITIES LITIGATION.

### No. 368.

Judicial Panel on Multidistrict Litigation.

March 1, 1979.

Before MURRAY I. GURFEIN, Chairman, and EDWIN A. ROBSON, STANLEY A. WEIGEL, ANDREW A. CAFFREY, ROY W. HARPER and CHARLES R. WEINER, Judges of the Panel.

### OPINION AND ORDER

PER CURIAM.

### I. BACKGROUND

This litigation consists of six actions pending in two districts: three in the

Southern District of New York and three in the Eastern District of Pennsylvania. The principal defendants in these actions are Food Fair, Inc. and several of its present and former officers and directors. Ten of these individuals are named as defendants in each action, and Food Fair is a defendant in four actions. Other defendants named in one or more of these actions include 1) a realty firm and three other companies (Richman Associates, Inc., MGS Incentives Company and Filigree Foods, Inc.) allegedly owned by certain of the other defendants; 2) an individual employed by two of these companies; 3) Food Fair's accounting firm; and 4) Food Fair's general counsel.[1]

Four of the actions before the Panel, two in New York and two in Pennsylvania, were commenced as class actions. No class determinations have yet been made in any of these actions.

The first New York class action was commenced on behalf of all persons who purchased securities of Food Fair between October 25, 1975 and October 2, 1978. Plaintiff in this action alleges that defendants violated the Securities Exchange Act of 1934 in connection with a variety of Food Fair's public statements from 1975 through October 2, 1978. The complaint charges that Food Fair failed, *inter alia,* to disclose that Food Fair was encountering difficulties in obtaining goods from certain suppliers; that Food Fair was unable to make quantity purchases and obtain normal discounts, thereby substantially increasing its operating costs; and that the Friedland family was involved in self-dealings and conflicts of interest concerning Food Fair and other companies that supply merchandise to Food Fair.

The second New York class action was commenced on behalf of all persons who purchased certain subordinated debentures of Food Fair in the open market between 1975 and October 2, 1978. The complaint in this action alleges numerous violations of the Securities Exchange Act of 1934 in connection with a variety of Food Fair's public statements from 1974 through October 3, 1978. Specifically, plaintiff claims that many of Food Fair's published materials during that time period were falsely optimistic, giving the misleading impression that Food Fair's operations and financial condition were in a healthy and proper condition. These materials failed to disclose, plaintiff alleges, the emergence of strong competitors, as well as Food Fair's declining position in the marketplace; Food Fair's high theft and pilferage rate; Food Fair's continuing labor problems; Food Fair's poor merchandising programs; Food Fair's inability to stock its supermarkets; and Food Fair's difficulties in obtaining credit from merchants and financing institutions. The complaint in this action also alleges that Food Fair failed to disclose the Friedland family's numerous self-dealings and conflicts of interests, and the "resultant loss of obtaining the best possible merchandise . . . at the best possible prices and deliveries."

Except for some of the class action allegations, the complaints in the two Pennsylvania class actions are virtually identical. The first of these actions was brought on behalf of all persons who purchased Food Fair common stock between approximately October 1, 1977 and October 2, 1978, and suffered damages as a result thereof; the class action allegations of the second action differ only in that the purported class period runs from April 1, 1978 to "at least" October 2, 1978. The complaints in both actions allege that defendants violated the Securities Exchange Act of 1934 as a result of various misrepresentations and omissions during the purported class periods set forth above. Plaintiffs charge that Food Fair failed, *inter alia,* to disclose its liquidity problems; its inability to arrange adequate financing; its credit problems with suppliers; its delinquencies in making timely payments to suppliers; its inventory shortages;

---

1. Some of the defendants in these actions are hereinafter collectively referred to as "the Friedland family." The Friedland family allegedly owns a substantial amount of Food Fair's common stock and members of the family hold or held key positions in Food Fair's management.

its inability to maintain accurate accounting controls; and its substantial operating losses incurred or to be incurred in fiscal 1978 and the first quarter of fiscal 1979. The complaint also alleges that Food Fair failed to disclose that certain food brokers and wholesalers with which Food Fair conducted a substantial amount of business were operated "by friends and relatives of the Friedland [family] and executives of Food Fair. . . ."

The remaining two actions before us are both derivative actions brought on behalf of Food Fair. The complaints both charge that the Friedland family dominates and controls the operations of Food Fair and its board of directors. The complaint in the Pennsylvania derivative action further alleges a series of transactions whereby the Friedland family gained ownership or control of Richman, MGS Incentives and Filigree, and then caused Food Fair and some of its subsidiaries and divisions to deal with those three companies on terms favorable to the Friedland family but highly unfair to Food Fair. Included in the complaint are allegations of diversions of corporate opportunities, self-dealings, and conflicts of interest. The complaint in the New York derivative action includes similar allegations as to Richman and Filigree, but does not specifically involve MGS Incentives.

On October 2, 1978, Food Fair filed a petition in the Southern District of New York for protection under Chapter XI of the Federal Bankruptcy Act. On that same day, the bankruptcy judge before whom the reorganization proceedings are pending granted Food Fair's petition and also entered an order restraining, *inter alia,* the prosecution of any actions against Food Fair. Under the supervision of the bankruptcy judge, the parties in the bankruptcy proceedings are, *inter alia,* continuing an investigation of Food Fair that was commenced in August 1978 by Food Fair's Audit Committee (composed of Food Fair's outside directors).

## II. *PROCEEDINGS BEFORE THE PANEL*

Food Fair, all but one of its present or former directors who are defendants in this litigation, Food Fair's general counsel, Filigree, and the realty firm allegedly owned by the Friedland family have moved the Panel, pursuant to 28 U.S.C. § 1407, to centralize four of the six actions before us in the Southern District of New York for coordinated or consolidated pretrial proceedings. The other two actions now before the Panel came to our attention too late to be included in the hearing order in this litigation. Plaintiffs in these two actions, however, have agreed to be bound by our determination, and, since all the defendants in these actions are already before the Panel, these actions are included in the order we are herewith entering under Section 1407.

Plaintiff in one of the Pennsylvania class actions opposes transfer. Should the Panel find transfer appropriate, however, this plaintiff favors the Eastern District of Pennsylvania as the transferee district. All other parties that have taken a position before the Panel favor or do not oppose transfer of all actions to a single district. Various parties have urged centralization of all actions in the Southern District of New York, and plaintiff in the Pennsylvania derivative action favors centralization in the Eastern District of Pennsylvania.

We find that these actions involve common questions of fact and that transfer of the New York actions under Section 1407 to the Eastern District of Pennsylvania for centralized pretrial proceedings with the actions pending there will best serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.

## III. *THE QUESTION OF TRANSFER*

Plaintiff in one of the Pennsylvania class actions, who is the sole party opposing transfer, initially argues that her action and the derivative actions share only "peripheral" questions of fact. This plaintiff states that the principal wrongdoing alleged in the derivative actions concerns the relationships between Food Fair and certain of its suppli-

ers, whereas her action is brought under the federal securities laws and focuses on certain specific allegedly misleading statements issued by defendants. While recognizing that her action and the derivative actions share factual questions concerning the Friedland family's alleged self-dealings and conflicts of interests with regard to certain food brokers and wholesalers, this plaintiff maintains that she need prove no wrongdoing concerning these matters, "but need show only that certain dealings which took place, even if they involved no wrongdoing on the part of the Food Fair directors . . . nevertheless had an influence on Food Fair suppliers." Such allegedly minimal common factual matters provide no predicate for Section 1407 transfer, this plaintiff asserts.

This plaintiff contends that the impropriety of coordinating or consolidating her action with the derivative actions is made even more apparent in the light of certain conflicts which may arise between the class and derivative actions. In her class action, plaintiff argues, she will have to prove wrongful acts by Food Fair. Plaintiffs in the derivative actions on the other hand, are suing on behalf of Food Fair, and must seek to defend Food Fair against charges of wrongdoing.[2] Moreover, although in her action the parties and the court must go through the process of class action determination, this plaintiff maintains, such proceedings are irrelevant to plaintiffs in the derivative action and would unduly delay progress in those actions.

This plaintiff also opposes coordination or consolidation of pretrial proceedings in her action with those in the New York class actions. The purported class period in those two actions is more extensive than that in her action, this plaintiff argues, and proof of the more limited misrepresentations and omissions at issue in her action may require her to prove that statements in annual reports in previous years were correct, con-

trary to the allegations in the New York class actions. In addition, this plaintiff contends, an additional area of conflict may arise because recovery by purchasers of debentures in one of the New York class actions may affect the possibility of recovery on behalf of purchasers of common stock, given Food Fair's current financial situation. This plaintiff maintains that, absent a showing of substantial benefit from the coordination or consolidation of the class actions, these potential conflicts are a sufficient basis upon which to deny Section 1407 transfer of these actions.

In order to avoid any possible duplicative discovery in the class and/or derivative actions, this plaintiff suggests that the parties stipulate that all discovery in any action be available for use in all actions.

Finally, this plaintiff suggests that the terms of the restraining order issued in the bankruptcy proceedings may serve to stay all proceedings against Food Fair in this litigation. Should this be the case, inclusion of the four actions in which Food Fair is a defendant in Section 1407 proceedings will create "difficulties in procedure," this plaintiff contends.

We find these arguments unpersuasive. Although we recognize that some unique factual questions may be involved in certain of the actions before us, an analysis of the record before us reveals a commonality of factual questions among all actions concerning, *inter alia,* the relationships among Food Fair, the Friedland family and many of Food Fair's brokers and wholesalers, as well as the impact of those alleged relationships upon Food Fair's dealings with other, unrelated suppliers of merchandise. Thus, centralization under Section 1407 is necessary in order to prevent duplication of discovery, eliminate the possibility of conflicting pretrial rulings, and conserve the time and effort of the parties, the witnesses and the judiciary. *See In re Investors Funding*

---

2. Plaintiff in the second Pennsylvania class action also contends that there are a number of serious potential conflicts between the derivative actions and the class actions. This plaintiff suggests that the Panel could easily resolve these potential conflicts by ordering that the transferee judge establish separate and distinct committees of plaintiffs' counsel for the derivative actions and the class actions.

*Corp. of New York Securities Litigation,* 437 F.Supp. 1199, 1200–02 (Jud.Pan.Mult. Lit.1977). The need for centralization is further highlighted by the presence of overlapping class determination requests in some of the actions now before us. *See In re Hawaiian Hotel Room Rate Antitrust Litigation,* 438 F.Supp. 935, 936 (Jud.Pan. Mult.Lit.1977). While voluntary cooperation among parties and their counsel is always commendable, transfer under Section 1407 and the assignment of all actions to a single judge will ensure the streamlining of discovery and all other pretrial proceedings as well. *See In re Commonwealth Oil/Tesoro Petroleum Securities Litigation,* 458 F.Supp. 225, 229 (Jud.Pan.Mult.Lit. 1978).

We are convinced that the possible existence of certain conflicts between the class actions and the derivative actions, as well as among some of the class actions, commends, rather than militates against, Section 1407 transfer.[3]

In other multidistrict dockets we have repeatedly held, as we do here, that antagonistic interests among the parties may be accommodated by the transferee judge, who, from day-to-day contact with all aspects of the litigation, will be in the best position to protect the rights of all concerned, while at the same time streamlining the pretrial process. *See, e. g., In re Corrugated Container Antitrust Litigation,* [447 F.Supp. 468, 471 (Jud. Pan.Mult.Lit.1978)] . . . ; *In re Sugar Industry Antitrust Litigation,* 437 F.Supp. 1204, 1206–08 (Jud.Pan.Mult.Lit. 1977) . . . .

*In re Uranium Industry Antitrust Litigation,* 458 F.Supp. 1223, 1230 (Jud.Pan.Mult. Lit.1978). *See In re Franklin National Bank Securities Litigation,* 393 F.Supp. 1093, 1095 (Jud.Pan.Mult.Lit.1975) (class

and derivative actions centralized before a single transferee judge). Any discovery unique to a particular party or action can, of course, be scheduled by the transferee judge to proceed concurrently with the common discovery, thus enhancing the efficient conduct of the litigation. *See In re Republic National-Realty Equities Securities Litigation,* 382 F.Supp. 1403, 1405–06 (Jud.Pan.Mult.Lit.1974). And no party must participate in pretrial proceedings which that party believes will not affect its interests. *See, e. g., Manual for Complex Litigation,* Parts I and II, §§ 2.31 (rev. ed. 1977).

The order entered in the bankruptcy proceedings pending in the Southern District of New York that stays certain proceedings against Food Fair in no way affects the authority of the Panel to transfer the actions in which Food Fair is a defendant, nor does Section 1407 transfer itself affect the present status of those actions. In *In re Franklin National Bank Securities Litigation, supra,* 393 F.Supp. at 1095–96, the Panel was faced with a similar situation and held as follows:

Transfer of these actions under Section 1407 in no way affects the operation of the stay brought about by Bankruptcy Rule 401. We are simply indicating the place where the pretrial proceedings of these actions will occur. The question of the effect of the bankruptcy stay and any modification thereof is entirely a problem to be worked out by the transferee court, the bankruptcy court and the parties. A Section 1407 transfer will produce the salutary consequence of having a single judge coordinate these actions with the bankruptcy proceedings and thereby eliminate the possibility of inconsistent rulings.

---

**3.** The suggestion that the Panel order the transferee judge to establish separate committees of plaintiffs' counsel for the derivative actions and the class actions evidences a misunderstanding of the Panel's function under Section 1407. The Panel has neither the power nor the inclination to dictate in any way the manner in which transferee judges supervise actions pending before them. *See, e. g., In re Westinghouse Electric Corporation Uranium Contract Litigation,* 436 F.Supp. 990, 996 (Jud.Pan.Mult. Lit.1977); *In re Plumbing Fixture Cases,* 298 F.Supp. 484, 489 (Jud.Pan.Mult.Lit.1968). Such a request is more properly addressed to the transferee judge.

See *In re Capital Underwriters, Inc. Securities Litigation,* 464 F.Supp. 955, 960 (Jud. Pan.Mult.Lit.1978).

## IV. THE TRANSFEREE DISTRICT

The parties that favor centralization of these actions in the Southern District of New York rely primarily on the pendency of Food Fair's Chapter XI bankruptcy proceedings in that district. These parties argue that the accounting firm retained by the Creditor's Committee in the bankruptcy proceedings has been ordered by the bankruptcy judge to conduct a thorough and wide-ranging investigation into the operations of Food Fair, the Friedland family and other companies associated with Food Fair and the Friedland family. This investigation, these parties assert, is well underway and will closely parallel the subject matter of the actions before the Panel. Moreover, these parties contend, thousands of Food Fair's documents, many of which may be sought in the course of pretrial proceedings in the actions before the Panel, are now under the exclusive jurisdiction of the bankruptcy court. 11 U.S.C. § 511. Thus centralization of all actions in the Southern District of New York will best promote coordination between the bankruptcy proceedings and the actions before the Panel, these parties conclude.

We have often recognized the importance of coordinating civil actions with related bankruptcy proceedings, and frequently the Panel has transferred litigations to a district in which related bankruptcy proceedings are pending. *See, e. g., In re Commonwealth Oil/Tesoro Petroleum Securities Litigation, supra,* 458 F.Supp. at 230. Under the circumstances of the present litigation, however, we are persuaded that transferring the civil actions to the Eastern District of Pennsylvania will result in the most efficient and expeditious resolution of these actions. The record before us clearly reveals that the Eastern District of Pennsylvania is the "center of gravity" of the civil actions. For example, in the course of deposing the members of Food Fair's Audit Committee, plaintiff in one of the actions before us has discovered that the Audit Committee, after some deliberation, elected to centralize its activities in Philadelphia and to retain Philadelphia rather than New York counsel, because the activities and records in which the Audit Committee was interested were themselves centered in Philadelphia. *E. g.,* Transcript at 16. In addition, while the Creditor's Committee in the bankruptcy proceedings has retained an accounting firm to investigate the activities of Food Fair, its directors and others, that investigation itself will be centered in Philadelphia. *Id.* at 15. The numerous sound reasons for centering not only these investigations, but also pretrial proceedings in the actions now before the Panel, in the Eastern District of Pennsylvania include the following: 1) because Food Fair, as well as Richman and MGS, maintain their headquarters in that district, and a majority of the individual defendants reside there, many relevant documents and anticipated witnesses are located there; and 2) Food Fair's accounting firm, which is named as a defendant in one of the actions before the Panel, maintains its records and work papers concerning Food Fair in Philadelphia.

While Food Fair's documents are at the present time under the control of the bankruptcy judge in the Southern District of New York, in fact these documents are physically located in Philadelphia, and the parties and counsel involved in the bankruptcy proceedings in New York have examined, and are continuing to examine, these documents in Philadelphia. We are confident that communication and cooperation between the judges handling the civil actions and the bankruptcy proceedings, if viewed appropriate by those judges, together with the cooperation and assistance of all parties and their counsel, will accomplish any coordination which may be necessary between the bankruptcy proceedings and the civil actions, including the consideration of any requests that the private litigants may make for access to and use of Food Fair's documents. Any coordination efforts will, of course, be facilitated by the geographical accessibility of Philadelphia to New York. *See In re Plumbing Fixture*

*Cases,* 295 F.Supp. 33, 33–34 (Jud.Pan.Mult. Lit.1968).

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions listed on the following Schedule A and pending in the Southern District of New York be, and the same hereby are, transferred to the Eastern District of Pennsylvania and, with the consent of that court, assigned to the Honorable Daniel H. Huyett, III, for coordinated or consolidated pretrial proceedings with the actions listed on Schedule A and already pending there.

### SCHEDULE A

#### Southern District of New York

| | |
|---|---|
| Alton E. Gross v. Harold Friedland, et al. | Civil Action No. 78 Civ 4162 |
| Eleanor Bader v. Food Fair, Inc., et al. | Civil Action No. 78 Civ 4844 |
| William Elster v. Samuel Friedland, et al. | Civil Action No. 78 Civ 6074 |

#### Eastern District of Pennsylvania

| | |
|---|---|
| Harry Lewis v. Filigree Foods, Inc., et al. | Civil Action No. 79–2905 |
| Mary M. Stein, etc. v. Jack M. Friedland, et al. | Civil Action No. 78–3667 |
| Steven Goldman v. Jack M. Friedland, et al. | Civil Action No. 78–4378 |